GORDON SILVER
THOMAS J. SALERNO, ESQ.
Arizona Bar No.: 007492
Email: tsalerno@gordonsilver.com
TERESA M. PILATOWICZ, ESQ.
Arizona Bar No.: 024447
Email: tpilatowicz@gordonsilver.com
One East Washington Street, Suite 400
Phoenix, Arizona 85004
Telephone: (602) 256-0400
Facsimile: (602) 256-0345

TALITHA GRAY KOZLOWSKI
Nevada Bar No. 9040 (*Pro Hac Pending*)
Email: tgray@gordonsilver.com
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
Telephone: (702) 796-5555
Facsimile: (702) 369-2666

HELLER, DRAPER, PATRICK, HORN & DABNEY, L.L.C.
WILLIAM H. PATRICK, III, ESQ.
Louisiana Bar No. 10359 (*Pro Hac Pending*)
E-mail: wpatrick@hellerdraper.com
TRISTAN E. MANTHEY, ESQ.
Louisiana Bar No. 24539 (*Pro Hac Pending*)
E-mail: tmanthey@hellerdraper.com
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399

*Proposed Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SNTECH, INC., a Delaware corporation,<br><br>      Debtor. | Case No. 2:14-BK-17914-EPB<br>Chapter 11<br><br><br><br>Date: OST REQUESTED<br>Time: OST REQUESTED |

**DEBTOR'S EMERGENCY MOTION SEEKING INTERIM AND FINAL ORDERS: (1) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (2) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE, (3) AUTHORIZING USE OF CASH COLLATERAL, AND (4) SETTING AND PRESCRIBING THE FORM AND MANNER OF NOTICE FOR A FINAL HEARING**

SNTech, Inc., debtor and debtor-in-possession ("Debtor"), hereby submits its motion (the "Motion") for entry of an interim order (the "Interim Order," a copy of which is attached hereto as **Exhibit "1"** and is incorporated herein by reference) and setting a final hearing for the entry of a final order (the "Final Order"): (1) authorizing Debtor to enter into a debtor-in-possession

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

Case 2:14-bk-17914-EPB   Doc 24   Filed 12/05/14   Entered 12/05/14 02:06:28   Desc
Main Document   Page 1 of 26

credit facility (the "<u>DIP Credit Facility</u>") pursuant to Sections[1] 105, 363, 364, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with Municipal Employees Retirement Systems of Louisiana ("<u>MERS</u>"), as lender and as collateral agent and administrative agent (together with its participants, successors, and assigns, the "<u>Lender</u>"); (2) granting the Lender liens and allowing the Lender's claim as administrative expense priority pursuant to Sections 364(c)(1), (c)(2), and (d), and 507(b) of the Bankruptcy Code; (3) authorizing the use of Cash Collateral (defined herein); and (4) in accordance with Rules 4001(b)(2) and (c)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and all applicable local bankruptcy rules, including LR 4001-4, scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion, and approving notice with respect thereto.

> **This Motion seeks, among other things, entry of a proposed order that would (1) authorize Debtor to pay the pre-petition DIP Advance Loan (defined herein) of MERS, (2) prime Knobbe, Martens, Olson & Bear's and SAIL Exit Partners, LLC's pre-petition liens under Section 364(d)(1) without their consent, (3) pay severance pay earned prepetition and the salaries of officers, directors, and/or insiders in amounts not to exceed the Bankruptcy Code's priority amounts, (4) waive (i) any of Debtor's or its estate's right or claim to surcharge the Lender, the DIP Credit Facility or Collateral pursuant to 11 U.S.C. § 506(c) or otherwise, (ii) the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, and (iii) any and all claims Debtor may have against Lender, including claims under Article V of the Bankruptcy Code; (5) acknowledge the validity and priority of the Lender's pre-petition security position on Debtor's pre-petition assets**

---

[1] All references to "<u>Chapter</u>" and "<u>Section</u>" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "<u>Bankruptcy Rule</u>" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "<u>Local Rule</u>" or "<u>LR</u>" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Arizona.

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

**and its Liens on the Collateral to secure all debt to Lender; (6) provide that upon entry of the Final Order, the Collateral shall also secure all pre-petition debts owed to Lender, but such liens granted upon entry of the Final Order to secure pre-petition debts of Lender shall not prime any valid, enforceable, non-avoidable liens on Collateral of other pre-petition secured creditors for their pre-petition claims not otherwise primed by Lender's pre-petition liens on the Collateral; and (7) provide that the DIP Credit Facility shall not be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Credit Facility or the liens on or security interests in the assets of Debtor securing the DIP Credit Facility, (ii) pursue through motion, complaint, or otherwise any other claims against the Lender in connection with the DIP Credit Facility or DIP Credit Facility Order (defined below), including any appeal of the DIP Credit Facility Order, or (iii) pursue through motion, complaint, or otherwise any litigation against the Lender or its nominee in connection with any other claim or cause of action. The basis for the relief requested in this Motion is set forth in paragraphs 4 through 43 below.**

This Motion is supported by the entire record of the case, the *Omnibus Declaration of Shannon Bard in Support of Debtor's Chapter 11 Petition and First Day Motions* (the "Omnibus Declaration"), filed concurrently herewith, and any argument of counsel entertained by the court at the time of the hearing on the Motion.

## I.
## BANKRUPTCY RULE 4001 CONCISE STATEMENT

By this Motion, Debtor requests:[2] (a) entry of the Interim Order and the Final Order

---

[2] The following is a brief summary only, and nothing herein is intended or should be construed

102215-001/2498910

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

authorizing Debtor: (i) to obtain post-petition financing pursuant to Sections 105, 363, and 364 of the Bankruptcy Code up to a maximum principal amount of $1,400,000 (the "DIP Availability"), excluding Lender fees and costs, in accordance with the term sheet attached to this Motion as **Exhibit "2"** (the "Term Sheet"), executed among Debtor, as borrower, and the Lender, and the Approved Budget, attached hereto as **Exhibit "3"**, and any related documents to be drafted and required to be delivered in connection with the Term Sheet (collectively, with the Term Sheet, the "DIP Loan Documents")[3]; (ii) to authorize Debtor under Sections 364(c)(1), (c)(2), and (d) of the Bankruptcy Code to grant a first-priority, senior lien and security interest in substantially all of Debtor's assets and an administrative expense claim to the Lender; and (iii) pending a final hearing, to and including the date on which the Final Order is entered, to obtain emergency post-petition advances in the amount of $750,000, provided the DIP Advance Loan (as defined herein) is paid with the first disbursement under the Interim Order, through the Final Hearing; (b) to authorize Debtor to use Cash Collateral; and (c) in accordance with Bankruptcy Rules 4001(b)(2) and (c)(2), to schedule the Final Hearing and approve notice with respect thereto.

The material provisions of the proposed debtor-in-possession financing are summarized as follows:

a)  **Borrower**: Debtor. See Term Sheet, p. 1.

b)  **Lender**: Municipal Employees Retirement System of Louisiana, as lender and as collateral agent and administrative agent (together with its participants, successors and assigns, which is anticipated to include Roland Interests, LLC as a participant). See id.

c)  **Commitment**: A Maximum Amount of up to One Million and Four Hundred Thousand and 00/100 Dollars ($1,400,000). See id. at p. 2. Under the Interim Order, Debtor may borrow up to $750,000, provided the DIP Advance Loan is paid with the first

—————————————— (continued)
as altering or amending the Term Sheet.

[3] Debtor proposes that the DIP Credit Facility be granted on an interim basis under the terms of the Term Sheet and the Interim Order. Prior to a final hearing on this Motion, Debtor and the Lender will file a credit agreement and other documents reflecting the agreement set forth in the Term Sheet.

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

4

disbursement under the Interim Order  See id. at pps. 2-3.

        d)    **Term.**    The earliest of (i) March 15, 2015, (ii) the occurrence of a Default or an Event of Default (as defined in the Term Sheet), (iii) the indefeasible payment in full of the Obligations to the Lender; (iv) January 9, 2015, if the Bidding Procedures Order is not entered by that date, (v) February 26, 2015, if no Auction shall have occurred on or prior to that date, (vi) February 27, 2015, if no Prevailing Bidders shall have occurred on or prior to that date, or (vii) the closing of a sale of Borrower or substantially all of Borrower's marketable assets to any purchaser (any of these a "<u>Maturity Date</u>"). <u>See</u> <u>id.</u> at p. 4.

        e)    **Purpose**:    To (i) extinguish advances made by Lender under that certain Senior Secured Promissory Note dated November 10, 2014 (the "<u>DIP Advance Loan</u>") in anticipation of the filing of the case, which provided the funding that allowed the Borrower to preserve its assets and file its petition for relief, (ii) fund operating expenses of Borrower in accordance with the Approved Budget, (iii) provide financing to facilitate the orderly sale of the Borrower's assets, including protecting overseas assets from seizure and/or sale, (iv) to purchase assets owned by SNTech Co., Ltd. and Thai SNTech Co., Ltd; and (v) pay Lender's reasonable legal fees and expenses. <u>See</u> <u>id.</u> at pps. 1-2.

        f)    **Collateral.**    Subject to the Carve Out (defined below), pursuant to Sections 364(c) and (d), the amount of the obligations of Debtor for the repayment of the DIP Credit Facility and any and all interest, costs, expenses and any other amounts Debtor owes Lender under the Term Sheet, the DIP Loan Documents, Interim Order and Final Order (collectively, all such amounts, the "<u>DIP Obligations</u>") shall be secured by automatically perfected first priority, priming, and post-petition security interests in and liens ("<u>Liens</u>") on all of the properties and assets of the Borrower, real and personal, including, but not limited to, the "<u>Collateral</u>" and all other assets described in the DIP Loan Documents, the Interim Order, Final Order and hereafter acquired real and personal property of the Borrower, and its bankruptcy estate (including claims and causes of action), whether acquired prior to or after the Petition Date, whether now owned and existing or hereafter acquired, created or arising, and all products and proceeds thereof (including without limitation, claims of the Borrower against third parties for loss or damage to such property), including all accessions thereto, substitutions and replacements thereof, and wherever located, except that avoidance actions under Sections 544, 545, 547, 548 , 550, 551, or 553 of the Bankruptcy Code are excluded.  Upon entry of the Final Order, the Collateral shall also secure all pre-petition debts owed to Lender, but such liens granted

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

upon entry of the Final Order to secure pre-petition debts of Lender shall not prime any valid, enforceable, non- avoidable liens on Collateral of other pre-petition secured creditors for their pre-petition claims not otherwise primed by Lender's pre- petition liens on the Collateral. See id. at p. 5.

g) **Allowance of Superpriority Claim.** The Lender shall also receive and be entitled, pursuant to Section 364(c)(1) of the Bankruptcy Code, to a super-priority administrative expense claim in the amount of DIP Obligations (the "Superpriority Claim") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out. See id., at p. 7.

h) **Carve-Out.** "Carve Out" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6), and (b) allowed fees and expenses incurred by Court-approved attorneys retained pursuant to Sections 327, 328, and 1103 of the Bankruptcy Code and as provided for in the Approved Budget; provided, however, for each advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal fees and expenses funded pursuant to the amounts set forth in the Approved Budget for the prior period corresponding to such advance; provided, however, that any budgeted but unfunded amounts for professional fees in a particular period may be used in any other period of the Approved Budget; provided, further that the Carve Out shall continue to apply to funds advanced to Debtor for purposes of paying professional fees under the Approved Budget, but which have not yet been disbursed notwithstanding any termination of the DIP Credit Facility. Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above. Following an Event of Default, in addition to the professional fees and expenses incurred through the week of the occurrence of the Event of Default and otherwise payable pursuant to the Approved Budget, the Lender shall advance up to $25,000 for professional fees incurred by Court-approved attorneys retained pursuant to Sections 327, 328 and 1103 of the Bankruptcy Code after such Event of Default, but only to the extent that amounts previously advanced by Lender for the purpose of paying budgeted legal or professional fees together with retainers previously paid, are insufficient to satisfy the allowed amount of such pre- and post-default fees and expenses. In event the Chapter 11 Case is dismissed or converted, or the jurisdiction of the Bankruptcy Court

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

is otherwise terminated, fees and expenses allowed and paid to professionals on an interim or final basis shall not be subject to disgorgement for the benefit of the Lender. See id. at pps. 5-6.

i)    **Interest**:    Interest shall accrue in respect of all DIP Obligations (as defined in the Loan Agreement) at the Interest Rate of fifteen percent (15%) and, following the occurrence of an Event of Default (defined below), twenty-one percent (21%). See id. at p. 7.

j)    **Fees**. Debtor shall pay to Lender a commitment fee in an amount equal to three (3%) percent of the DIP Availability (the "Commitment Fee"). Fifty percent (50%) of the Commitment Fee shall be earned and paid upon the entry of the Interim Order, and fifty percent (50%) of the Commitment Fee shall be earned and paid upon the entry of the Final Order. See id.

Debtor does not owe monthly fees to Lender or other fees other than the Commitment Fee. See id. at p. 7.

k)    **Expenses**. All costs incurred by the Lender in any way related to the Borrower or associated with the Loan or the bankruptcy case or planning related to them, including, but not limited to, the reasonable fees and expenses of its financial advisor, Meketa Investment Group, legal fees and expenses of its primary counsel (Kean Miller LLP), local counsel (Sherman & Howard), Participant's counsel (Greenberg Traurig, LLP), counsel retained in Korea and Thailand, and all related costs, and all costs and fees associated with any appraisal, report, or review shall be chargeable to the DIP Facility, but shall not reduce the amount available to be drawn by Debtor under the DIP Facility, after three (3) business days' notice to Borrower, the U.S. Trustee and any official committee formed in the case ("Notice Parties"). In the event any of the Notice Parties have an objection to the compensation or reimbursements sought and such Notice Party is unable to reach an agreement with the professionals of the Lender or Participant with respect thereto, any undisputed amounts may be paid by the Borrower and the Lender's or Participant's professional may file a motion for expedited hearing in the Bankruptcy Court to resolve the dispute. To the extent Lender provides any of these services internally, Borrower will reimburse Lender for these costs at market rates. See id. at p. 8.

l)    **Conditions to Closing**. The conditions to closing are set forth in pages 8-12 of the Term Sheet. The conditions to closing contain standard provisions for debtor-in-possession financing; as well as a condition which provides that, with respect to advances under the Final Order, no advances will be available unless the

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

Final Order provides for the validity and priority of the Liens over all of the Borrower's assets to secure any and all indebtedness to Lender, which shall be an integral part of the Final Order and not subject to further review more than seven (7) days after the entry of the Final Order. However, such Liens granted upon entry of the Final Order to secure pre-petition debts of Lender shall not prime any valid, enforceable, non-avoidable liens on Collateral of other pre-petition secured creditors for their pre-petition claims not otherwise primed by Lender's pre-petition liens on the Collateral.

If no challenge is timely asserted (1) to the Collateral securing Lender's pre-petition debt, (2) to the validity, enforceability, priority, perfection, or the amount of Lender's prepetition indebtedness, and Lender's pre-petition security interests in and liens on Debtor's assets, or (3) against Lender for any claims or causes of action: (i) the Collateral shall secure all pre-petition debts owed to Lender, but such liens to secure pre-petition debts of Lender shall not prime any valid, enforceable, non-avoidable liens on Collateral of other pre-petition secured creditors for their pre-petition claims not otherwise primed by Lender's pre-petition liens on the Collateral; (ii) Lender's pre-petition indebtedness shall constitute allowed claims (without the necessity of filing proofs of claim) against Debtor and shall not be subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, or otherwise; (iii) Lender's prepetition liens shall be deemed legal, valid, binding, enforceable, duly perfected, not subject to defense, counterclaim, offset of any kind, or subordination, and such liens are otherwise unavoidable; and (iv) Lender, Lender's prepetition indebtedness, Lender's prepetition loan documents, and Lender's prepetition liens shall not be subject to any other or further claims, counterclaims, causes of action, lawsuits, or challenges by any party-in-interest or any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed by or elected for Debtor), and Debtor, all other parties and all other persons shall be forever barred and enjoined from taking any of the actions or asserting any of the claims or defenses set forth in the foregoing clauses (i), (ii), (iii), and (iv). Nothing in the Final Order vests or confers on any person, including any committee appointed in this case, standing or authority to pursue any cause of action belonging to Debtor or its estates, including, without limitation, any claims or defenses with respect to Lender's prepetition liens or the prepetition indebtedness. See id. at pps. 8-12.

m) **Sale and/or Orderly Liquidation of Borrower's Assets.** Borrower agrees that it will continue to use best efforts to conduct

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

a going concern sale of its assets in accordance with the Interim Order and in the Bidding Procedures Order, and as summarized below:

(1) The Bidding Procedures Motion will be filed by December 12, 2014, with a hearing as soon as practical but in any event no later than January 8, 2015;

(2) The Bidding Procedures Order will be entered by January 9, 2015;

(3) All Qualified Bids are due by the Bid Deadline of February 23, 2015;

(4) On or before February 27, 2015, the Borrower shall complete the Auction, if applicable, among the Qualified Bidders;

(5) Should Borrower not receive a Qualified Bid by the Bid Deadline or should the Back Up Transaction be determined to be the Prevailing Bid at the Auction, then the Borrower shall seek approval of the sale of substantially all of the Borrower's Assets at the Sale Hearing to Lender or its nominee for a purchase price in an amount equal to a credit bid of all amounts advanced under the DIP Credit Facility (the "<u>Back Up Transaction</u>"), plus cash in an amount sufficient to pay all unpaid administrative expenses not otherwise payable pursuant to the Approved Budget in an amount not to exceed $50,000.00 in the aggregate, with a closing date of no later than March 10, 2015. The asset purchase agreement, other agreements, and all pleadings related to the Back Up Transaction shall be in a form and substance acceptable to Lender;

(7) Any objections to Sale Motion, other than to Designated Agreements and proposed Cure Costs, as defined in the Bidding Procedures Order, must be filed with the Bankruptcy Court and emailed to counsel for Borrower, Lender, and any Official Committee of Unsecured Creditors at least two business days before the hearing on the Prevailing Bidder Sale Order;

(8) On or before February 27, 2015, the Borrower shall receive the approval of the Bankruptcy Court for the Sale Transaction to the Prevailing Bidder and the resulting Prevailing Bidder Sale Order shall be in form and substance agreed to by the Lender, including providing for the payment at closing of all outstanding pre and post-

9

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

bankruptcy indebtedness owed by Borrower to Lender in satisfaction of the liens of Lender..

See id. at pps. 13-15.

n)      **Events of Default**: The Events of Default are set forth in pages 12-14 of the Term Sheet. The Events of Default contain standard provisions for debtor-in-possession financing. See id. at pps. 16-18.

o)      **Representations and Warranties**. The representation and warrants are set forth in pages on page 12 of the Term Sheet. The representation and warranties contain standard provisions for debtor-in-possession financing; except for one representation which provides that Debtor represents and warrants to Lender that the Final Order shall contain a representation and stipulation acknowledging the validity and priority of Lender's pre-petition security position on Borrower's pre-petition assets and its Liens on the Collateral to secure all debt to Lender, which representation and stipulation shall be final and not subject to further review more than seven (7) days after entry of the Final Order. Liens granted upon entry of the Final Order to secure pre-petition debts of Lender shall not prime any valid, enforceable, non-avoidable liens on Collateral of other pre-petition secured creditors for their pre-petition claims not otherwise primed by Lender's pre-petition liens on the Collateral. See id. at p. 12.

p)      **Waivers.** In partial consideration of the Carve-Out, Debtor on behalf of itself and its bankruptcy estate waives (i) any right or claim to surcharge the Lender, the DIP Credit Facility or Collateral pursuant to 11 U.S.C. § 506(c) or otherwise and (ii) the "equities of the case" exception in Section 552(b) of the Bankruptcy Code. See id. at p. 7. Also, a condition to the closing is that the Debtor waives any and all claims it may have against Lender, including claims under Article V of the Bankruptcy Code. See id. at p. 12.

q)      **Indemnification**. Debtor agrees to indemnify and hold harmless, and provide limitations of liability to the Lender, and each of its affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives in connection with the DIP Credit Facility, subject to customary limitations for gross negligence and willful misconduct. See id. at p. 19.

r)      **Approved Budget.** The Approved Budget reflecting Debtor's projected cash flow needs through March 31, 2015 is attached hereto as Exhibit 3.

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

## II.
## STATUS OF THE CASE AND JURISDICTION

1.      On December 4, 2014 (the "Petition Date"), Debtor filed its voluntary petitions for relief under Chapter 11 of the Bankruptcy Code thereby commencing the above-captioned case (the "Chapter 11 Case"). Debtor has continued in the possession of its property and is operating and managing its business as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No request for a trustee or examiner has been made and no creditors' committee has yet been appointed in this case. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D) and (O). Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are Sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code , Bankruptcy Rules 4001, 6004, and 9014, and LR 4001-4(b).

## III.
## BACKGROUND

### A.      Debtor's History and Operations.

4.      Debtor is a Delaware corporation formed in 2007. Debtor operates in Phoenix, Arizona and is the 100% equity owner of SNTech Co., Ltd. ("SNTech Korea"), which was formed and operates in Korea, and Thai SNTech Co., Ltd. ("SNTech Thailand"), which was formed and operates in Thailand.

5.      Debtor develops, manufactures, and sells high efficiency, smart electric motors for a wide variety of mainstream commercial and residential applications. Debtor offers Electronically Commutated Motors ("ECM") that are more efficient than their energy exhausting competitors and which integrate proprietary software and wireless communications compatible with any building management system ("distributed intelligence"). Debtor is focused on the Heating, Ventilating, and Air Conditioning ("HVAC") and the Pump end markets, with

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

approximately 20% and 80% of its historic production in each of these markets, respectively. Debtor's four main products are used in ventilation, refrigeration, aftermarket, pool and spa applications, as well as heating and cooling applications, such as furnaces, air handlers, heat pumps, and air conditioners.

6. In 2011, while pursuing a campaign to raise funds to support its HVAC Motor business, Debtor was approached by the Department of Justice ("DOJ") and Regal Beloit Corporation ("RBC") to acquire RBC's Pool & Spa Pump Motor business ("PM Business"). The divestiture was a requirement by the DOJ for the purpose of remedying the loss of competition alleged by RBC's acquisition of its largest competitor, A.O. Smith Corporation (Case No. 1:11-cv-01487-ESH). Debtor immediately sidelined its campaign to raise funds for its HVAC Motor business and instead raised $15 million to acquire all of the assets of RBC's PM Business. A timeline and other commitments to transfer the PM Business were made by RBC and memorialized by the DOJ in their Final Order. RBC did not perform as promised and SNTech suffered significant losses. Immediately following the close of the transaction with RBC, and concurrent with the transfer of the PM business, Debtor sought an additional $15 million of working capital to support the combined HVAC and PM businesses. SNTech was able to secure smaller, incremental funding, primarily from its majority shareholder SAIL Capital Partners, to keep the company in business but failed to raise sufficient cash to support the newly combined operations.

7. SNTech Korea manufactures the high efficiency "ECM" motors sold to the HVAC and Pump end markets. In addition, the Korean group provides engineering services and support for customer qualification, testing, UL approval and product development. While all of the manufacturing equipment located in Korea was either purchased directly by Debtor or with funds transferred from Debtor to SNTech Korea for purposes of acquiring the equipment, SNTech Korea has reported that it, rather than Debtor, owns a portion of the equipment purchased with Debtor's funds. SNTech Thailand was established following the acquisition of RBC's PM Business and transfer of assets from its Fasco Thailand manufacturing facility. The operation produces key components for the high efficiency ECM Pump end market, which are

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

shipped to Korea for assembly. Similarly, while the equipment and assets located in Thailand were either purchased directly by Debtor or with funds transferred, either directly or indirectly, from Debtor to SNTech Thailand for the purpose of acquiring the equipment, SNTech Thailand has reported that it, rather than Debtor, owns a portion of the equipment purchased with Debtor's funds. SNTech Korea and SNTech Thailand have not filed for chapter 11 protection.

8. At Debtor's peak in 2012, it reported sales growth from $1.2 million and 10,000 units in 2010 to approximately $21 million and 200,000 units in 2012. During this period, the growth was in part attributed to the acquisition of the PM Business in 2011. In early 2014, SNTech stopped producing ECMs because it lacked sufficient credit and capital to procure component parts to satisfy open purchase orders.

9. Debtor worked with its majority shareholder, SAIL Capital Partners, to support an exhaustive effort to secure funding through the third quarter of 2014. Realizing that it would not be able to continue as a going concern, the Company engaged the services of the Gordian Group, LLC ("Gordian") to provide guidance. After review of SNTech's financial condition and a series of meetings between Debtor and Gordian, it became apparent that it would be in Debtor's best interests to conduct a sale process run by Gordian under the supervision and jurisdiction of this Court.

10. At the present time, Debtor maintains a skeleton crew to protect and preserve its assets and to assist in its efforts to sell its assets as a going concern.

**B. Debtor's Secured Loan Obligations.**

**(a) The MERS Loans.**

11. On or about August 17, 2011, Debtor executed a Convertible Senior Secured Promissory Note ("MERS Original Note") in the amount of $3,000,000 payable to MERS. On or about December 31, 2012, Debtor and MERS executed an Amendment to a Convertible Senior Secured Promissory Note, amending among other things, the principal amount of the MERS Original Note to $3,330,082 (as amended, the "MERS Loan").

12. In connection with the MERS Loan, Debtor executed a Security Agreement and Patent Security Agreement, granting MERS a first priority consensual lien upon all of Debtor's

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400
102215-001/2498910

real and personal property (the "MERS Collateral").

13.     Debtor owes MERS approximately $4,060,252 in principal and past-due interest on the MERS Loan, plus accrued interest, legal fees and related costs.

14.     On or about November 10, 2014, Debtor also entered into that certain Senior Secured Promissory Note dated November 10, 2014 (the "DIP Advance Loan") in the original principal amount of $350,000 in anticipation of the filing of the bankruptcy case, which provided the funding that allowed Debtor to preserve its assets and file its petition for relief.  The DIP Credit Facility will be used in part to pay off the DIP Advance Loan.

15.     When MERS made the DIP Advance Loan, the Debtor had a zero ($0.00) balance in its bank account and no source of revenue.  The DIP Advance Loan allowed the Debtor to pay past-due payroll to its employees and related tax liabilities that were due November 7, 2014, and to pay its November 21, 2014 payroll and tax liabilities when due.  The DIP Advance Loan provided funds necessary to pay past-due licensing fees to Underwriters Laboratories ("UL"); absent that payment, UL would have cancelled the Debtor's UL license, which would have made all of the Debtor's current inventory – potentially worth hundreds of thousands of dollars – unsaleable and worthless.  Tens of thousands of dollars' worth of inventory will now be available as part of the anticipated sale of the Debtor's assets.  The DIP Advance Loan also allowed the Debtor to: hire its bankruptcy counsel; pay past-due insurance premiums and avoid cancellation of and/or reinstate its general liability, workers' compensation, directors & officers, group health, and group life and disability insurance policies; and send funds to its subsidiaries in Korea and Thailand to pay some of the  past-due wages and past-due rent they owe so that the physical assets and human expertise in those countries could be preserved for a bankruptcy sale.

**(b)     The CapFlow Loan.**

16.     On or about July 1, 2013, Debtor entered into that certain Factoring and Security Agreement and Purchase Order Assignment Agreement with CapFlow Funding Group Managers LLC.  CapFlow agreed to accept the assignment of purchase orders and fund those purchases in an amount not to exceed $3,000,000 (the "CapFlow Loan").  Debtor issued a Stock Purchase Warrant to CapFlow and granted CapFlow a general security interest in all of Debtor's assets.

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

14

102215-001/2498910

17. On the same date, CapFlow and MERS entered into a Subordination Agreement, pursuant to which MERS agreed to subordinate its first priority security interest and liens on Debtor's assets to CapFlow. Thus, CapFlow has a senior priority lien on Debtor's Collateral. Notwithstanding the subordination by MERS to the CapFlow Loan, CapFlow has agreed that the liens and superpriority expenses granted Lender to secure the DIP Obligations up to an aggregate amount of $1,350,000.00 will prime the CapFlow Loan and any liens securing the CapFlow Loan.

18. Debtor owes CapFlow approximately $1,833,000.00 on the CapFlow Loan.

(c) **Other Prepetition Secured Claims.**

a. **Knobbe, Martens Olson & Bear, LLP (CA).**

19. As of September 30, 2014, Debtor owes Knobbe, Martens, Olson & Bear ("KMOB") for legal services performed for Debtor in the approximate amount of $79,870, plus interest and late charges that have been asserted in the approximate amount of $15,349.22. On October 13, 2013, KMOB filed a UCC-1 (#34101193) asserting a lien in all Debtor's intellectual property that has ever been the subject of KMOB's representation of Debtor and all files and records relating thereto, including recoveries from any litigation/judgments involving Debtor's intellectual property and certain of Debtor's patents, which are specifically set forth in KMOB's UCC-1 filing.

b. **Brent Roland.**

20. On November 11, 2013, Brent Roland ("Roland") filed a UCC-1 (#34692514) asserting a lien in all Debtor's assets. Roland is owed approximately $560,000.00 in principal, plus accrued interest. Roland has agreed that the liens and superpriority expenses granted Lender to secure the DIP Obligations will prime his loan and any liens securing his loan. In it anticipated that Roland Interests, LLC, of which Roland is a member, will purchase a participating interest in the DIP Credit Facility for MERS.

c. **SAIL Exit Partners, LLC.**

21. On August 27, 2014, SAIL Exit Partners, LLC ("SAIL," and collectively with KMOB and Roland, the "Other Secured Creditors") filed a UCC-1 (#43450632) asserting a lien

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

in all of Debtor's assets. SAIL is owed approximately $3,160,945 in principal, plus accrued interest of approximately $238,000, pursuant to a series of Convertible Senior Secured Promissory Notes.

**C.** <u>**Other Claims.**</u>

22. Debtor owes approximately $1,756,600, plus accrued interest of approximately $158,000 on other promissory notes, the majority of which are convertible notes, and approximately $9.5 Million on other general unsecured accounts payable claims.

**IV.**
<u>**RELIEF REQUESTED**</u>

23. Debtor hereby requests: (i) entry of the Interim Order (a) approving on an interim basis the Term Sheet, (b) authorizing Debtor to obtain pursuant to the Term Sheet, on an emergency basis, advances in a sum not to exceed $750,000, (c) granting the Lender the liens and superpriority claims described in the Interim Order, (d) authorizing the use of Cash Collateral, and (e) scheduling a final hearing, and, after such hearing, (ii) entry of a Final Order (a) approving on a final basis the DIP Loan Documents, (b) authorizing Debtor to obtain post-petition financing up to the aggregate amount of the DIP Availability, (c) authorizing Debtor to pay all interest, fees, expenses, and other obligations provided for under the DIP Loan Documents, (d) granting the Lender the liens and superpriority claims described in the Final Order, and (e) authorizing Debtor to satisfy all conditions precedent and perform all obligations thereunder in accordance with the terms of the DIP Loan Documents.

24. As a condition to the willingness of the Lender to fund the advances under the DIP Credit Facility to Debtor, Debtor seeks to grant the Lender automatically perfected first priority, priming, and post-petition security interests in and liens on all of the properties and assets of Debtor, pursuant to Sections 364(c) and (d) and an allowed claim for administrative expenses pursuant to the provisions of Sections 364(c)(1) and 507(b) of the Bankruptcy Code.

. . .

. . .

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

16

# V.
## BASIS FOR RELIEF REQUESTED

**A.      Debtor's Need for Financing.**

25.      Debtor requires approval of the DIP Credit Facility to (i) extinguish the debts incurred under the DIP Advance Loan, (ii) to fund operating expenses of Debtor in accordance with the Approved Budget, (iii) to facilitate the orderly sale of Debtor's assets, including protecting overseas assets from seizure and/or sale, (iv) purchase assets owned by SNTech Korea and SNTech Thailand, and (v) pay the Lender's reasonable legal fees and expenses.

26.      The DIP Credit Facility includes sufficient funds to cover the projected operational expenses and administrative fees and costs related to the Chapter 11 case, and the expenses related to the sale process. The Approved Budget projects the operational costs, administrative fees related to the Chapter 11 case, and expenses related to the sale process through March 2015.

27.      As set forth in the Approved Budget, the DIP Credit Facility also provides sufficient funds for Debtor to purchase the equipment that has been reported as being owned by SNTech Korea and SNTech Thailand. The equipment to be purchased is necessary to preserve and maximize Debtor's going concern value as the equipment located in Korea is integral to manufacturing the high efficiency ECM motors sold to the HVAC and Pump end markets and the equipment located in Thailand produces the key components for the high efficiency ECM Pump end market. The proceeds from Debtor's purchase of this equipment will be utilized by SNTech Korea and SNTech Thailand to pay their respective rent, current and delinquent payroll for the few remaining key employees, severance payments mandated by Korean law for employees that were terminated as part of Debtor and SNTech Korea's downsizing of operations, legal costs, and other vital operational and asset preservation expenses. Such payments are necessary to ensure that SNTech Korea and SNTech Thailand maintain and preserve through the conclusion of the sale the operations and equipment located in Korea and Thailand, thereby maximizing the value of Debtor's assets and going concern value.

. . .

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

28. Debtor cannot meet its ongoing post-petition obligations unless it has the immediate authorization to access to the DIP Credit Facility in accordance with the Term Sheet. In the absence of such use, immediate and irreparable harm will result to Debtor, the estate, and its creditors, and will render a sale of Debtor's business impossible.

29. Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to borrowing availability to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business. Unless Debtor has access to such additional funds, Debtor's ability to maximize value through an orderly sale process will be jeopardized.

30. The continued maintenance of Debtor's business protects the estate's interest, and serves to mitigate the risk of diminution in value that could result if operating expenses, including payroll, the administrative expenses, and sale related expenses were not funded.

31. The requested relief is necessary for Debtor to preserve the going-concern value of its assets and to minimize the disruption of Debtor's efforts to sell its assets in an orderly fashion. Debtor has no post-Petition Date revenue to fund its operational expenses, administrative costs, and a sale of its assets, and a DIP Loan is its only source of funding to preserve and protect its assets for an orderly and efficient sale. Debtor will suffer immediate and irreparable harm unless it is immediately authorized to obtain financing in the amount and on the terms and conditions set forth in the Interim Order and in the Term Sheet. Debtor believes that the terms and conditions of the Term Sheet, DIP Loan Documents, the Interim Order, and Final Order and the related relief requested herein are fair, reasonable, and in the best interests of Debtor, its creditors, and its estate.

**B.     Approval Under Section 364 of the Bankruptcy Code.**

32. Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security. Debtor has been unable to obtain financing in the form of unsecured credit, allowable under Section 364(b) of the Bankruptcy Code as an administrative expense. Debtor is unable to obtain unsecured credit out of the ordinary course of business or credit with specialized priority or with security. It has raised

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

significant funds in the past but because of its present financial condition is no longer able to do so - hence, the cessation of its business operations and decision to sell all or substantially all of its assets. In order to fund the sale process of its assets, Debtor's management solicited substantially all current investors in Debtor to provide DIP financing, and all have declined requests to provide additional equity or debt financing to Debtor. The only exception is Lender, which has agreed to provide a DIP loan to Debtor on the terms stated herein. Thus, Debtor proposes to obtain financing under the Term Sheet, DIP Loan Documents, the Interim Order, and the Final Order pursuant to Sections 105, 364(c) and (d) and 507(b) of the Bankruptcy Code.

33. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d)(1) of the Bankruptcy Code provides that the Court may authorize a debtor to incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate protection of the interest of the holder of the lien on which such senior or equal lien is to be granted. Debtor propose to obtain the financing set forth in the DIP Credit Facility by providing, *inter alia,* superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2) and 507(b), with respect to CapFlow's prepetition liens and the Other Secured Creditors' liens, and 364(d)(1) of the Bankruptcy Code.

34. Debtor submits that with respect to the granting of a Section 364(d)(1) senior lien to CapFlow's and the Other Secured Creditors' liens, CapFlow and the Other Secured Creditors will be adequately protected. Moreover, CapFlow and Roland have specifically consented to the senior liens granted to secure the DIP Obligations. Without the advances under the DIP Credit Facility, the collateral for such claims is essentially worthless.

. . .

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

**C.**    **Debtor Does Not Have an Alternative to the DIP Loan.**

35.    If necessary, the evidence at the interim hearing will show that a credit facility of this type is needed in this bankruptcy case.  The U.S. Court of Appeals for the Ninth Circuit has recognized that immediate interim relief may be crucial to the success of a corporate reorganization:

> We realize that in certain circumstances, the entire reorganization effort may be thwarted if emergency leave is withheld and that reorganization under the Bankruptcy Code is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund a central business operation.  It is for this reason that Congress specified that hearings concerning the use of cash collateral "shall be scheduled in accordance with the needs of the debtor."

In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (citations omitted).

36.    The Lender is uniquely positioned and motivated to assist Debtor in its sale process.  Lender is already, of course, familiar with Debtor's business operations, corporate structure, financing arrangements, and assets, and has already performed any due diligence necessary in connection with the DIP Credit Facility.  Debtor believes that it could not obtain financing from any other lender on terms more favorable than the DIP Credit Facility offered by the Lender, or for that matter, on any terms, and certainly not before all of Debtor's limited cash resources were depleted by the search. Debtor has been seeking additional loans and equity for months from existing creditors and investors and from new sources of potential capital – all to no avail. The proposed DIP Credit Facility is the only financing available to Debtor. Debtor exercised its best business judgment in negotiating the Term Sheet the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing.

**D.**    **Application of the Business Judgment Standard.**

37.    As described above, Debtor has concluded that the DIP Credit Facility provides the only reasonable alternative available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S.

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

20

523, 550 (1943); <u>Ames</u>, 115 B.R. at 38 (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); <u>In re Lifeguard Indus., Inc.</u>, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

38.     In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  <u>See In re Curlew Valley Assoc.</u>, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." <u>Id.</u> at 513-14 (footnotes omitted).  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. <u>See, e.g.</u>, <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in-interest."); <u>see also</u> <u>In re Yellowstone Mountain Club, LLC</u>, 2008 WL 5869859 (Bankr. D. Montana, November 26, 2008) (acknowledging the use of the business judgment standard with respect to approval of Section 364 financing).

39.     Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to funds to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business.  Unless Debtor has access to such additional funds, the going concern value of Debtor's business will be diminished, and Debtor's ability to maximize value will be jeopardized.  The funds provided under the DIP Credit Facility will enable Debtor to pay

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

operating expenses and fund the orderly sale of its assets.

40.     Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Loan Documents.  Accordingly, Debtor should be granted authority to borrow funds from the Lender described above, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, and take the other actions contemplated herein.

41.     Debtor exercised its best business judgment in negotiating the Term Sheet and the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing.

**E.      Good Faith.**

42.     Section 364(e) of the Bankruptcy Code was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction."  In re EDC Holding Co., 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of Section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge"); see also In re North Atlantic Millwork Corp., 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

43.     The proposed DIP Credit Facility is and will be the result of good faith and arm's-length negotiations, with all parties represented by counsel.  Debtor believes that the terms of the DIP Loan are fair and reasonable under the circumstances, and that the Lender is in good faith and is entitled to the benefits of Section 364(e) of the Bankruptcy Code.

. . .

. . .

. . .

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

44. As discussed above, in the ordinary course of its prepetition operations, not only has Debtor directly purchased equipment that was ultimately located in Korea and Thailand and utilized by SNTech Korea and SNTech Thailand, respectively, but Debtor has tendered funds to SNTech Korea and SNTech Thailand for the purpose of acquiring additional equipment. Furthermore, in the ordinary course of its prepetition operations, Debtor has provided significant funds through loans and otherwise to SNTech Korea and SNTech Thailand to enable them to pay their respective rent, payroll, and other operating expenses. Provided this, Debtor submits that the use of a portion of the DIP Loan to purchase equipment from SNTech Korea and SNTech Thailand, the proceeds of which will be utilized by SNTech Korea and SNTech Thailand to pay their rent, payroll, and other operating expenses, is an ordinary course transaction within the meaning of Section 363(c) of the Bankruptcy Code.

45. To the extent that this transaction is determined not to be in Debtor's ordinary course of business, Debtor seeks approval of the purchase pursuant to Section 363(b)(1) of the Bankruptcy Code, which provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

46. Debtor's purchase of the equipment and SNTech Korea and SNTech Thailand's use of the proceeds to pay their respective rent, payroll, and related operating and asset preservation expenses in order to preserve and maintain the equipment is integral to maximizing the value of Debtor's estate and the sale price achieved in the contemplated sale. As such, Debtor submits that the purchase of SNTech Korea and SNTech Thailand's equipment more than amply satisfies Section 363(b)'s requirement that the transaction be supported by a valid business justification. See <u>Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1069-71 (2d Cir. 1983); <u>Walter v. Sunwest Bank (In re Walter)</u>, 83 B.R.

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

1    14, 19-20 (B.A.P. 9th Cir. 1988); 240 North Brand Partners, Ltd. v. Colony GFP Partners (In re

2    240 North Brand Partners, Ltd.), 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996).

3    **G.      Request to Use Cash Collateral.**

4              47.      Debtor also seeks authority to use the cash collateral in which CapFlow, MERS,

5    Roland, SAIL may have an interest (the "Cash Collateral"). Under Bankruptcy Code § 362(c)(2).

6    The Court may authorize Debtor to use cash collateral as long as the applicable secured creditors

7    consent or are adequately protected. See, In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984); In re

8    McCormick, 354 B.R. 246, 251 (Bankr. C.D.Ill. 2006) (providing that use of cash collateral of a

9    secured creditor requires the secured creditor's consent or adequate protection of the secured

10   creditor's interest in the cash collateral).

11             48.      Debtor has no cash other than loan proceeds advanced by the Lender pursuant to

12   the DIP Credit Facility. To the extent such advances constitute cash collateral, Debtor seeks

13   authority to use such loan advances for the payment of items set forth in the Approved Budget.

14   MERS, CapFlow, and Roland have consented to the use of such loan proceeds as provided in the

15   Approved Budget.  SAIL has not consented to the use of cash collateral.

16             49.      Regardless of whether MERS, CapFlow, Roland, and SAIL consent to Debtor's

17   use of Cash Collateral, the Court may approve Debtor's use of Cash Collateral if the Court

18   determines that sufficient adequate protection exists. Adequate protection exists through the

19   preservation of the value of Debtor's estate. See, e.g., In re Erie Hilton Joint Venture, 125 B.R.

20   140, 149 (Bankr. W.D.Pa. 1991) ("Preservation of the going-concern value of the business can

21   constitute a benefit to the secured creditor."). MERS, CapFlow, Roland, and SAIL are

22   adequately protected.   The funding from the DIP Credit Facility is being used to preserve the

23   assets of Debtor's estate for the benefit of all Debtor's creditors, which constitute adequate

24   protection.   Additionally, to the extent SAIL is not secured, it is not entitled to adequate

25   protection.

26             50.      Considering the foregoing, Debtor submits that MERS, CapFlow, Roland, and

27   SAIL have consented to the use of cash which may constitute Cash Collateral and/or are

28   adequately protected with respect to any diminution in the value of the Cash Collateral resulting

24

Gordon Silver
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

Case 2:14-bk-17914-EPB    Doc 24    Filed 12/05/14    Entered 12/05/14 02:06:28    Desc
Main Document    Page 24 of 26

from Debtor's use of Cash Collateral under Bankruptcy Code §§ 361 and 363.

**H.      Interim Approval of the DIP Loan and Use of Cash Collateral.**

51.      Bankruptcy Rules 4001(b)(2) and (c)(2) provide that a final hearing on a motion for the use of cash collateral and to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

52.      Pursuant to Bankruptcy Rules 4001(b) and (c), Debtor requests that the Court conduct an expedited interim hearing to consider entry of the Interim Order authorizing Debtor to use Cash Collateral and borrow an amount sufficient to fund its operating expenses pending a final hearing on the DIP Credit Facility and request to use Cash Collateral.

53.      No prior request for the relief sought herein has been made to this or any other Court.

**VI.**

**<u>NOTICE AND REQUEST FOR FINAL HEARING</u>**

54.      Debtor shall serve notice of this Motion on the following: (i) the Office of the United States Trustee for the District of Arizona; (ii) the holders of the twenty (20) largest unsecured claims against Debtor, or any official committee of unsecured creditors, if one is appointed pursuant to Section 1102 of the Bankruptcy Code; (iii) any other committee that is appointed pursuant to Section 1102 of the Bankruptcy Code; (iv) CapFlow; (v) Knobbe, Martens Olson & Bear, LLP (CA); (vi) Brent Roland; (vii) MERS; and (viii) other interested parties as listed on the service list, and any entity which files and serves on Debtor a request for special notice prior to the filing of this Motion.  Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

55.      Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), Debtor also respectfully requests that the Court schedule the final hearing on this Motion.  Such relief is necessary in

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

102215-001/2498910

Case 2:14-bk-17914-EPB    Doc 24    Filed 12/05/14    Entered 12/05/14 02:06:28    Desc
Main Document    Page 25 of 26

order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to Debtor's estate.

## VII.
## CONCLUSION

**WHEREFORE**, Debtor respectfully request (a) entry of an order substantially in the form of the proposed Interim Order attached hereto as **Exhibit "1,"** (b) after a final hearing entry of a Final Order approving the relief requested herein, substantially in the form that shall be filed with the Court, and (c) such other and further relief as is just and equitable.

DATED this 4th day of December, 2014.

GORDON SILVER

_/s/ Teresa M. Pilatowicz_
THOMAS J. SALERNO, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
(*Pro Hac Pending*)
TERESA M. PILATOWICZ, ESQ.
One East Washington Street, Suite 400
Phoenix, Arizona 85004

and

HELLER, DRAPER, PATRICK, HORN & DABNEY, L.L.C.
WILLIAM H. PATRICK, III, ESQ.
(*Pro Hac Pending*)
TRISTAN E. MANTHEY, ESQ.
(*Pro Hac Pending*)
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103

*Proposed Attorneys for Debtor*

**Gordon Silver**
Attorneys At Law
One East Washington
Suite 400
Phoenix, AZ 85004
(602) 256-0400

26

102215-001/2498910