GORDON SILVER
THOMAS J. SALERNO, ESQ.
Arizona Bar No.: 007492
Email: tsalerno@gordonsilver.com
TERESA M. PILATOWICZ, ESQ.
Arizona Bar No.: 024447
Email: tpilatowicz@gordonsilver.com
One East Washington Street, Suite 400
Phoenix, Arizona 85004
Telephone: (602) 256-0400
Facsimile: (602) 256-0345

TALITHA GRAY KOZLOWSKI
Nevada Bar No. 9040 (*Pro Hac Pending*)
Email: tgray@gordonsilver.com
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
Telephone: (702) 796-5555
Facsimile: (702) 369-2666
*Proposed Attorneys for Debtor*

HELLER, DRAPER, PATRICK, HORN & DABNEY, L.L.C.
WILLIAM H. PATRICK, III, ESQ.
Louisiana Bar No. 10359 (*Pro Hac Pending*)
E-mail: wpatrick@hellerdraper.com
TRISTAN E. MANTHEY, ESQ.
Louisiana Bar No. 24539 (*Pro Hac Pending*)
E-mail: tmanthey@hellerdraper.com
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No. 2:14-BK-17914-EPB<br>Chapter 11 |
| SNTECH, INC., a Delaware corporation, | |
| Debtor. | Date: OST REQUESTED<br>Time: OST REQUESTED |

### OMNIBUS DECLARATION OF SHANNON BARD IN SUPPORT
### OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Shannon Bard, hereby declare as follows:

1.     I am over the age of 18 and am mentally competent.  I make this declaration in support of Debtor's Chapter[1] 11 Petition, *Debtor's Emergency Motion Seeking Interim and Final Orders: (1) Authorizing Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Superpriority Administrative Expense, (3) Authorizing Use of Cash Collateral, and (4) Setting and Prescribing the Form and Manner of Notice for a Final Hearing* (the "DIP Financing

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" or "LR" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Arizona.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

Case 2:14-bk-17914-EPB    Doc 25    Filed 12/05/14    Entered 12/05/14 02:50:33    Desc
Main Document    Page 1 of 22

Motion"); the *Emergency Motion for Order: (I) Authorizing Debtor to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses, and Other Employee Obligations; and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "Employee Wage Motion"); the *Debtor's Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) for Entry of an Order Authorizing the Employment and Retention of Gordian Group, LLC to Provide Investment Banking and Financial Advisory Services on a Percentage Fee Basis Nunc Pro Tunc to the Petition Date* (the "Gordian Application"); the *Application for Order Authorizing Employment of Gordon Silver as Co-Counsel for Debtor Nunc Pro Tunc to the Petition Date* (the "Gordon Silver Application"); the *Application for Order Authorizing Employment of Heller, Draper, Patrick, Horn & Dabney, L.LC. as Co-Counsel for Debtor Nunc Pro Tunc to the Petition Date* (the "Heller Draper Application," and collectively, the "First Day Motions").[2]

2. Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on December 4, 2014 (the "Petition Date").

3. I am the chief executive officer and sole member of the board of directors of SNTech, Inc. ("Debtor").

4. In my capacity as chief executive officer and sole board member, I am familiar with Debtor's business, operations, and financial affairs. Except as otherwise stated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

### A. Debtor's History.

5. Debtor is a Delaware corporation formed in 2007. Debtor operates in Phoenix, Arizona and is the 100% equity owner of SNTech Co., Ltd. ("SNTech Korea"), which was formed and operates in Korea, and Thai SNTech Co., Ltd. ("SNTech Thailand"), which was formed and operates in Thailand.

---

[2] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

2

6.     Debtor develops, manufactures, and sells high efficiency, smart electric motors for a wide variety of mainstream commercial and residential applications. Debtor offers Electronically Commutated Motors ("ECM") that are more efficient than their energy exhausting competitors and which integrate proprietary software and wireless communications compatible with any building management system. Debtor is focused on the Heating, Ventilating, and Air Conditioning ("HVAC") and the Pump end markets, with approximately 20% and 80% of its historic production in each of these markets, respectively. Debtor's four main products are used in ventilation, refrigeration, aftermarket, pool and spa applications, as well as heating and cooling applications, such as furnaces, air handlers, heat pumps, and air conditioners.

7.     In 2011, while pursuing a campaign to raise funds to support its HVAC Motor business, Debtor was approached by the Department of Justice ("DOJ") and Regal Beloit Corporation ("RBC") to acquire RBC's Pool & Spa Pump Motor business ("PM Business"). The divestiture was a requirement by the DOJ for the purpose of remedying the loss of competition alleged by RBC's acquisition of its largest competitor, A.O. Smith Corporation (Case No. 1:11-cv-01487-ESH). Debtor immediately sidelined its campaign to raise funds for its HVAC Motor business and instead raised $15 million to acquire all of the assets of RBC's PM Business. A timeline and other commitments to transfer the PM Business were made by RBC and memorialized by the DOJ in their Final Order. RBC did not perform as promised and SNTech suffered significant losses. Immediately following the close of the transaction with RBC, and concurrent with the transfer of the PM business, Debtor sought an additional $15 million of working capital to support the combined HVAC and PM businesses. SNTech was able to secure smaller, incremental funding, primarily from its majority shareholder SAIL Capital Partners, to keep the company in business but failed to raise sufficient cash to support the newly combined operations.

8.     SNTech Korea manufactures the high efficiency "ECM" motors sold to the HVAC and Pump end markets. In addition, the Korean group provides engineering services and support for customer qualification, testing, UL approval and product development. While all of the manufacturing equipment located in Korea was either purchased directly by Debtor or with

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

3

Case 2:14-bk-17914-EPB    Doc 25    Filed 12/05/14    Entered 12/05/14 02:50:33    Desc
Main Document      Page 3 of 22

funds transferred from Debtor to SNTech Korea for purposes of acquiring the equipment, SNTech Korea has reported that it, rather than Debtor, owns a portion of the equipment purchased with Debtor's funds. SNTech Thailand was established following the acquisition of RBC's PM Business and transfer of assets from its Fasco Thailand manufacturing facility. The operation produces key components for the high efficiency ECM Pump end market, which are shipped to Korea for assembly. Similarly, while the equipment and assets located in Thailand were either purchased directly by Debtor or with funds transferred, either directly or indirectly, from Debtor to SNTech Thailand for the purpose of acquiring the equipment, SNTech Thailand has reported that it, rather than Debtor, owns a portion of the equipment purchased with Debtor's funds. SNTech Korea and SNTech Thailand have not filed for chapter 11 protection.

9.      At Debtor's peak in 2012, it reported sales growth from $1.2 million and 10,000 units in 2010 to approximately $21 million and 200,000 units in 2012. During this period, the growth was in part attributed to the acquisition of the PM Business in 2011. In early 2014, SNTech stopped producing ECMs because it lacked sufficient credit and capital to procure component parts to satisfy open purchase orders.

10.      SNTech worked with its majority shareholder, SAIL Capital Partners, to support an exhaustive effort to secure funding through the third quarter of 2014. Realizing that it would not be able to continue as a going concern, the Company engaged the services of the Gordian Group, LLC ("Gordian") to provide guidance. After review of SNTech's financial condition and a series of meetings between Debtor and Gordian, it became apparent that it would be in Debtor's best interests to conduct a sale process run by Gordian under the supervision and jurisdiction of this Court.

11.      At the present time, Debtor maintains a skeleton crew to protect and preserve its assets and to assist in its efforts to sell its assets as a going concern.

**B.      Debtor's Secured Loan Obligations.**

**1.      The MERS Loans.**

12.      On or about August 17, 2011, Debtor executed a Convertible Senior Secured Promissory Note (the "MERS Original Note") in the amount of $3,000,000 payable to MERS.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

4

Case 2:14-bk-17914-EPB    Doc 25    Filed 12/05/14    Entered 12/05/14 02:50:33    Desc
Main Document      Page 4 of 22

On or about December 31, 2012, Debtor and MERS executed an Amendment to a Convertible Senior Secured Promissory Note, amending among other things, the principal amount of the MERS Original Note to $3,330,082 (as amended, the "MERS Loan"). True and correct copies of the notes are attached hereto as **Exhibits "1-A" and "1-B."**

13. In connection with the MERS Loan, Debtor executed a Security Agreement and Patent Security Agreement, granting MERS a first priority consensual lien upon all of Debtor's real and personal property (the "MERS Collateral"). True and correct copies of the Security Agreement and Patent Security Agreement are attached hereto as **Exhibits "1-C" and "1-D,"** respectively.

14. Debtor owes MERS approximately $4,060,252 in principal and past-due interest on the MERS Loan, plus accrued legal fees and related costs.

15. On or about November 10, 2014, Debtor also entered into that certain Senior Secured Promissory Note dated November 10, 2014 (the "DIP Advance Loan") in the original principal amount of $350,000[3] in anticipation of the filing of the bankruptcy case, which provided the funding that allowed Debtor to preserve its assets and file its petition for relief. The DIP Credit Facility will be used in part to pay off the DIP Advance Loan.

16. When MERS made the DIP Advance Loan, Debtor had a zero ($0.00) balance in its bank account and no source of revenue. The DIP Advance Loan allowed Debtor to pay past-due payroll to its employees and related tax liabilities that were due November 7, 2014, and to pay its November 21, 2014 payroll and tax liabilities when due. The DIP Advance Loan provided funds necessary to pay past-due licensing fees to Underwriters Laboratories ("UL"); absent that payment, UL would have cancelled Debtor's UL license, which would have made all of Debtor's current inventory – potentially worth hundreds of thousands of dollars – unsaleable and worthless. Tens of thousands of dollars' worth of inventory will now be available as part of the anticipated sale of Debtor's assets. The DIP Advance Loan also allowed Debtor to: hire its bankruptcy counsel; pay past-due insurance premiums and avoid cancellation of and/or reinstate

---

[3] The DIP Advance Loan was subsequently increased to $400,000.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

5

its general liability, workers' compensation, directors & officers, group health, and group life and disability insurance policies; and send funds to its subsidiaries in Korea and Thailand to pay some of the past-due wages and past-due rent they owe so that the physical assets and human expertise in those countries could be preserved for a bankruptcy sale.

### 2. The CapFlow Loan

17. On or about July 1, 2013, Debtor entered into that certain Factoring and Security Agreement and Purchase Order Assignment Agreement with CapFlow Funding Group Managers LLC. CapFlow agreed to accept the assignment of purchase orders and fund those purchases in an amount not to exceed $3,000,000 ("CapFlow Loan"). Debtor issued a Stock Purchase Warrant to CapFlow and granted CapFlow a general security interest in all of Debtor's assets. True and correct copies of the CapFlow Loan documents are attached hereto as **Exhibits "2-A" and "2-B."**

18. On the same date, Capflow and MERS entered into a Subordination Agreement, pursuant to which MERS agreed to subordinate its first priority security interest and liens on Debtor's assets to CapFlow. Thus, CapFlow has a senior priority lien on Debtor's assets. Notwithstanding the subordination by MERS to the CapFlow Loan, CapFlow has agreed that the liens and superpriority expenses granted Lender to secure the DIP Obligations up to an aggregate amount of $1,350,000 will prime the CapFlow Loan and any liens securing the CapFlow Loan. A true and correct copy of the Subordination Agreement is attached hereto as **Exhibit "3."**

19. Debtor owes CapFlow approximately $1,833,000 on the CapFlow Loan.

### 3. Other Prepetition Secured Claims.

#### a. Knobbe, Martens Olson & Bear, LLP (CA).

20. As of September 30, 2014, Debtor owes Knobbe, Martens, Olson & Bear ("KMOB") for legal services performed for Debtor in the approximate amount of $79,870.00, plus interest and late charges that have been asserted in the approximate amount of $15,349.22. On October 13, 2013, KMOB filed a UCC-1 (#34101193) asserting a lien in all Debtor's intellectual property that has ever been the subject of KMOB's representation of Debtor and all files and records relating thereto, including recoveries from any litigation/judgments involving

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

Debtor's intellectual property and certain of Debtor's patents, which are specifically set forth in KMOB's UCC-1 filing. A true and correct copy of the KMOB UCC Filing is attached hereto as **Exhibit "4."**

### b. Brent Roland.

21. On November 11, 2013, Brent Roland ("<u>Roland</u>") filed a UCC-1 (#34692514) asserting a lien in all Debtor's assets. Roland is owed approximately $560,000 in principal, plus accrued interest. Roland has agreed that the liens and superpriority expenses granted Lender to secure the DIP Obligations will prime his loan and any liens securing his loan. A true and correct copy of the Roland UCC Filing is attached hereto as **Exhibit "5."** It is anticipated that Roland Interests, LLC, of which Roland is a member, will purchase a participating interest in the DIP Credit Facility from MERS.

### c. SAIL Exit Partners, LLC.

22. On August 27, 2014, SAIL Exit Partners, LLC ("<u>SAIL</u>," and collectively with KMOB and Roland, the "<u>Other Secured Creditors</u>") filed a UCC-1 (#43450632) asserting a lien in all of Debtor's assets. SAIL is owed approximately $3,160,945 in principal, plus accrued interest of approximately $238,000, pursuant to a series of Convertible Senior Secured Promissory Notes. A true and correct copy of the SAIL UCC Filing is attached hereto as **Exhibit "6."**

### 4. <u>Other Claims.</u>

23. Debtor owes approximately $1,756,000, plus accrued interest of approximately $158,000 on other promissory notes, the majority of which are convertible notes, and approximately $9.5 Million on other general unsecured accounts payable claims.

## FIRST DAY MOTIONS

24. Debtor has commenced its Chapter 11 Case to address the above-discussed debt obligations and implement a sale under the supervision and jurisdiction of this Court. Debtor's transition into its Chapter 11 proceedings must be comprehensively and effectively organized to ensure that they will be able to operate smoothly in bankruptcy. It is important to minimize the

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

distractions to Debtor's business operations that could result from Debtor petitioning for Chapter 11 relief.

25.    I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable Debtor to operate in its Chapter 11 Case with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to Debtor's success and are in the best interests of Debtor and its creditors.

26.    The First Day Motions[4] include the following pleadings filed by Debtor in its Chapter 11 Case: (a) DIP Financing Motion; (b) Employee Wage Motion; (c) Gordian Application; (d) Gordon Silver Application; and (e) Heller Draper Motion.

## C.    The DIP Financing Motion.

27.    Pursuant to the DIP Financing Motion, Debtor requests: (a) entry of the Interim Order and the Final Order authorizing Debtor: (i) to obtain post-petition financing pursuant to Sections 105, 363, and 364 of the Bankruptcy Code up to a maximum principal amount of $1,400,000 (the "DIP Availability"), excluding Lender fees and costs, in accordance with the term sheet attached to the DIP Financing Motion as **Exhibit "2"** (the "Term Sheet"), executed among Debtor, as borrower, and the Lender, and the Approved Budget, attached to the DIP Financing Motion as **Exhibit "3,"** and any related documents to be drafted and required to be delivered in connection with the Term Sheet (collectively, with the Term Sheet, the "DIP Loan Documents"); (ii) to authorize Debtor under Section 364(c)(1), (c)(2), and (d) of the Bankruptcy Code to grant a first-priority, senior lien and security interest in substantially all of Debtor's assets and an administrative expense claim to the Lender; and (iii) pending a final hearing, to and including the date on which the Final Order is entered, to obtain emergency post-petition advances in the amount of $750,000.00, provided the DIP Advance Loan is paid with the first disbursement under the Interim Order, through the Final Hearing; (b) to authorize Debtor to use

---

[4] Capitalize terms in the following sections not otherwise defined herein shall have those meanings ascribed to them in the subject First Day Motion.

8

105013-001/2500562_1.doc

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

Cash Collateral; and (c) in accordance with Bankruptcy Rules 4001(b)(2) and (c)(2), to schedule the Final Hearing and approve notice with respect thereto.

28.     As a condition to the willingness of the Lender to fund the advances under the DIP Credit Facility to Debtor, Debtor seeks under the DIP Financing Motion to grant the Lender automatically perfected first priority, priming, and post-petition security interests in and liens on all of the properties and assets of Debtor, pursuant to Sections 364(c) and (d) and an allowed claim for administrative expenses pursuant to the provisions of Sections 364(c)(1) and 507(b) of the Bankruptcy Code.

## 1.     Debtor's Need for Financing.

29.     Debtor requires approval of the DIP Credit Facility to (i) extinguish the debts incurred under the DIP Advance Loan, (ii) to fund operating expenses of Debtor in accordance with the Approved Budget, (iii) to facilitate the orderly sale of Debtor's assets, including protecting overseas assets from seizure and/or sale, (iv) purchase assets owned by SNTech Korea and SNTech Thailand; and (v) pay the Lender's reasonable legal fees and expenses

30.     The DIP Credit Facility includes sufficient funds to cover the projected operational expenses and administrative fees and costs related to the Chapter 11 case, and the expenses related to the sale process. The Approved Budget projects the operational costs, administrative fees related to the Chapter 11 case, and expenses related to the sale process through March 2015.

31.     As set forth in the Approved Budget, the DIP Credit Facility also provides sufficient funds for Debtor to purchase the equipment that has been reported as being owned by SNTech Korea and SNTech Thailand.  The equipment to be purchased is necessary to preserve and maximize Debtor's going concern value as the equipment located in Korea is integral to manufacturing the high efficiency ECM motors sold to the HVAC and Pump end markets and the equipment located in Thailand produces the key components for the high efficiency ECM Pump end market.  The proceeds from Debtor's purchase of this equipment will be utilized by SNTech Korea and SNTech Thailand to pay their respective rent, current and delinquent payroll for the few remaining key employees, severance payments mandated by Korean law for

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

employees that were terminated as part of Debtor and SNTech Korea's downsizing of operations, legal costs, and other vital operational and asset preservation expenses. Such payments are necessary to ensure that SNTech Korea and SNTech Thailand maintain and preserve through the conclusion of the sale the operations and equipment located in Korea and Thailand, thereby maximizing the value of Debtor's assets and going concern value.

32.     Debtor cannot meet its ongoing post-petition obligations unless it has the immediate authorization to access to the DIP Credit Facility in accordance with the Term Sheet. In the absence of such use, immediate and irreparable harm will result to Debtor, the estate, and its creditors, and will render a sale of Debtor's business impossible.

33.     Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to borrowing availability to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business. Unless Debtor has access to such additional funds, Debtor's ability to maximize value through an orderly sale process will be jeopardized.

34.     The continued maintenance of Debtor's business protects the estate's interest, and serves to mitigate the risk of diminution in value that could result if operating expenses, including payroll, the administrative expenses, and sale related expenses were not funded.

35.     The requested relief is necessary for Debtor to preserve the going-concern value of its assets and to minimize the disruption of Debtor's efforts to sell its assets in an orderly fashion. Debtor has no post-Petition Date revenue to fund its operational expenses, administrative costs, and a sale of its assets, and a DIP Loan is its only source of funding to preserve and protect its assets for an orderly and efficient sale. Debtor will suffer immediate and irreparable harm unless it is immediately authorized to obtain financing in the amount and on the terms and conditions set forth in the Interim Order and in the Term Sheet. Debtor believes that the terms and conditions of the Term Sheet, DIP Loan Documents, the Interim Order, and Final Order and the related relief requested in the DIP Financing Motion are fair, reasonable, and in the best interests of Debtor, its creditors, and its estate.

. . .

. . .

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

10

## 2. Approval Under Section 364 of the Bankruptcy Code.

36. Debtor has been unable to obtain financing in the form of unsecured credit, allowable under Section 364(b) of the Bankruptcy Code as an administrative expense. Debtor is unable to obtain unsecured credit out of the ordinary course of business or credit with specialized priority or with security. It has raised significant funds in the past but because of its present financial condition is no longer able to do so - hence, the cessation of its business operations and decision to sell all or substantially all of its assets. In order to fund the sale process of its assets, Debtor's management solicited substantially all current investors in Debtor to provide DIP financing, and all have declined requests to provide additional equity or debt financing to Debtor. The only exception is Lender, which has agreed to provide a DIP loan to Debtor on the terms stated in the DIP Financing Motion. Thus, Debtor proposes to obtain financing under the Term Sheet, DIP Loan Documents, the Interim Order, and the Final Order pursuant to Sections 105, 364(c) and (d) and 507(b) of the Bankruptcy Code.

37. Debtor proposes to obtain the financing set forth in the DIP Credit Facility by providing, *inter alia,* superpriority claims, security interests, and liens pursuant to Sections 364(c)(l), (2) and 507(b), with respect to CapFlow's prepetition liens and the Other Secured Creditors' liens, and 364(d)(1) of the Bankruptcy Code.

38. Debtor submits that with respect to the granting of a Section 364(d)(1) senior lien to CapFlow's and the Other Secured Creditors' liens, CapFlow and the Other Secured Creditors will be adequately protected. Moreover, CapFlow and Roland have specifically consented to the senior liens granted to secure the DIP Obligations. Without the advances under the DIP Credit Facility, the collateral for such claims is essentially worthless.

## 3. Debtor Does Not Have an Alternative to the DIP Loan.

39. The Lender is uniquely positioned and motivated to assist Debtor in its sale process. Lender is already, of course, familiar with Debtor's business operations, corporate structure, financing arrangements, and assets, and has already performed any due diligence necessary in connection with the DIP Credit Facility. Debtor believes that it could not obtain financing from any other lender on terms more favorable than the DIP Credit Facility offered by

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

11

1  the Lender, or for that matter, on any terms, and certainly not before all of Debtor's limited cash

2  resources were depleted by the search.  Debtor has been seeking additional loans and equity for

3  months from existing creditors and investors and from new sources of potential capital – all to no

4  avail.  The proposed DIP Credit Facility is the only financing available to Debtor.  Debtor

5  exercised its best business judgment in negotiating the Term Sheet the Interim Order that is

6  presently before the Court and the proposed Final Order to be submitted at the final hearing.

7       **4.**     **Application of the Business Judgment Standard.**

8       40.     As described above, Debtor has concluded that the DIP Credit Facility provides

9  the only reasonable alternative available under the circumstances.

10       41.     Approval of the DIP Credit Facility will provide Debtor with immediate and

11  ongoing access to funds to avoid harm to Debtor's estate and potential erosion of the enterprise

12  value of Debtor's business.  Unless Debtor has access to such additional funds, the going

13  concern value of Debtor's business will be diminished, and Debtor's ability to maximize value

14  will be jeopardized.  The funds provided under the DIP Credit Facility will enable Debtor to pay

15  operating expenses and fund the orderly sale of its assets.

16       42.     Debtor has exercised sound business judgment in determining that a post-petition

17  credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP

18  Loan Documents.

19       43.     Debtor exercised its best business judgment in negotiating the Term Sheet and the

20  Interim Order that is presently before the Court and the proposed Final Order to be submitted at

21  the final hearing.

22       **5.**     **Good Faith.**

23       44.     The proposed DIP Credit Facility is and will be the result of good faith and arm's-

24  length negotiations, with all parties represented by counsel.  Debtor believes that the terms of the

25  DIP Loan are fair and reasonable under the circumstances, and that the Lender is in good faith

26  and is entitled to the benefits of Section 364(e) of the Bankruptcy Code.

27  . . .

28  . . .

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

6.     **Sound Business Justification Exists for the Purchase of SNTech Korea and SNTech's Assets.**

45.     As discussed above, in the ordinary course of its prepetition operations, not only has Debtor directly purchased equipment that was ultimately located in Korea and Thailand and utilized by SNTech Korea and SNTech Thailand, respectively, but Debtor has tendered funds to SNTech Korea and SNTech Thailand for the purpose of acquiring additional equipment. Furthermore, in the ordinary course of its prepetition operations, Debtor has provided significant funds through loans and otherwise to SNTech Korea and SNTech Thailand to enable them to pay their respective rent, payroll, and other operating expenses. Provided this, Debtor submits that the use of a portion of the DIP Loan to purchase equipment from SNTech Korea and SNTech Thailand, the proceeds of which will be utilized by SNTech Korea and SNTech Thailand to pay their rent, payroll, and other operating expenses, is an ordinary course transaction.

46.     Debtor's purchase of the equipment and SNTech Korea and SNTech Thailand's use of the proceeds to pay their respective rent, payroll, and related operating and asset preservation expenses in order to preserve and maintain the equipment is integral to maximizing the value of Debtor's estate and the sale price achieved in the contemplated sale.

47.     As such, Debtor submits that the purchase of SNTech Korea and SNTech Thailand's equipment is supported by a valid business justification.

7.     **Request to Use Cash Collateral.**

48.     Debtor also seeks authority to use the cash collateral in which CapFlow, MERS, Roland, and SAIL may have an interest (the "Cash Collateral").

49.     Debtor has no cash other than loan proceeds advanced by the Lender pursuant to the DIP Credit Facility. To the extent such advances constitute cash collateral, Debtor seeks authority to use such loan advances for the payment of items set forth in the Approved Budget. MERS, CapFlow, and Roland have consented to the use of such loan proceeds as provided in the Approved Budget. SAIL has not consented to the use of cash collateral.

50.     MERS, CapFlow, Roland, and SAIL are adequately protected. The funding from the DIP Credit Facility is being used to preserve the assets of Debtor's estate for the benefit of all

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

13

105013-001/2500562_1.doc

Debtor's creditors, which constitutes adequate protection. Additionally, to the extent SAIL is not secured, it is not entitled to adequate protection.

51. Considering the foregoing, Debtor submits that MERS, CapFlow, Roland and SAIL have consented to the use of cash which may constitute Cash Collateral and/or are adequately protected with respect to any diminution in the value of the Cash Collateral resulting from Debtor's use of Cash Collateral.

**D.     The Employee Wage Motion.**

52. As of the Petition Date, Debtor employed approximately six (6) full-time employees ("<u>Employees</u>") in the ordinary course of its business. Continued service by the Employees is vital to the value and preservation of Debtor's assets.

53. As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Debtor for wages and salaries incurred in the ordinary course of Debtor's business, including any prepetition compensation (collectively, the "<u>Wage Obligations</u>"). The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is approximately $26,493.00. Debtor pays its Employees on a bi-weekly payroll cycle. The last payroll was made on November 24, 2014.

54. Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that Debtor have deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

55. In addition, Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

56.     In addition, in the ordinary course of its business, Debtor has accrued amounts for health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, the "Employee Benefit Plans").  These benefits include health plans (i.e. medical, dental, vision, and life insurance), health savings accounts, various welfare plans (i.e. life insurance, disability insurances, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee assistance programs.  These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled.  The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date is estimated to be less than $2,000.00.

57.     In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor ("Reimbursable Business Expenses").  The Chapter 11 Case was filed during Debtor's normal payroll periods for hourly and salaried Employees and during their normal reimbursement cycle for Reimbursable Business Expenses.  Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed.  Debtor cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that amount does not exceed $500.  Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business.

58.     Debtor's Wage Obligations and Employee Benefit Contributions to be paid to or for the benefit of each of the Employees pursuant to Debtor's wages and Employee Obligations Motion will not exceed $12,475.00 per employee.

59.     If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that certain essential Employees will resign and that those Employees that remain will be discontented.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

15

Case 2:14-bk-17914-EPB    Doc 25    Filed 12/05/14    Entered 12/05/14 02:50:33    Desc
Main Document    Page 15 of 22

60.     Debtor will have sufficient cash to honor all of the foregoing employee related obligations if debtor-in-possession financing is approved by the Court.

61.     Continued payment of Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses, and maintaining their workers' compensation system, are essential to preserve the morale and to maintain positive relations between Debtor and its Employees.   If the relief requested in the Motion is not granted, the success of Debtor's Bankruptcy Case will be placed in substantial jeopardy.

**E.     The Gordian Application.**

62.     Debtor has selected Gordian because of the firm's considerable experience in the areas of investment banking and business reorganizations and other areas in which Gordian might be asked to assist in the Chapter 11 Case.  Debtor believes that Gordian is duly qualified to provide it with investment banking and financial advisory services throughout these proceedings and the services of Gordian are necessary and essential to Debtor's performance of its duties as debtor in possession.

63.     As a result of Debtor's prepetition engagement of Gordian, Gordian has become familiar with Debtor's business operations, capital structure, financing documents, and other material information, and is able to assist Debtor in its M&A efforts.  Debtor believes that Gordian is well-qualified to provide services to Debtor in a cost-effective, efficient, and timely manner.  Gordian has indicated a willingness to act on Debtor's behalf and subject itself to the jurisdiction and supervision of the Court.  Additionally, Debtor has been advised by Gordian that Gordian will coordinate with the other retained professionals in this Chapter 11 Case to eliminate unnecessary duplication or overlap of work.

64.     Debtor submits that the employment and retention of Gordian would be in the best interest of Debtor, its estate, and creditors.

**1.     Summary of Services to be Provided by Gordian and Terms of Engagement.**

65.     As more fully set forth in the Gordian Agreement, Debtor wishes to retain Gordian to provide investment banking and financial advisory services in this Chapter 11 Case to perform the following services in conjunction with a Sale Transaction and/or, to the extent

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

necessary, an Alternative Financial Transaction, as well as other services to the extent appropriate and as reasonably requested, from time to time, by Debtor:

> a.      assist in soliciting and evaluating proposals from potential parties to any possible Sale Transaction and with the marketing, negotiation, structuring and implementation of the Sale Transaction, including participation in negotiations with creditors, equity holders and other parties regarding the Sale Transaction and seeking approval of the Court for all aspects of the Sale Transaction;

> b.      assist in preparing, for review and approval by the Company, proposals to creditors, equity holders and other parties-in-interest in connection with any possible Sale Transaction;

> c.      assist with making presentations to the Company's Board of Directors and/or creditors or equity holders regarding any potential Sale Transaction and/or other financial issues related thereto;

> d.      assist, with comparable solicitation, evaluation, structuring, negotiation and presentation services as outlined in the preceding clauses (a) through (c), in connection with any possible Alternative Financial Transaction;

> e.      provide testimony in the Court, upon reasonable advance notice, regarding all aspects of any agreed Financial Transaction, including the marketing process, negotiations with potential participating parties and all other matters related thereto; and

> f.      render such other financial advisory and investment banking services as may be mutually agreed upon by the parties hereto.

66.      The terms and conditions of Gordian's proposed retention by Debtor are more fully set forth in the Gordian Agreement, attached as **Exhibit "1"** to the Kaufman Declaration.

67.      Debtor requires qualified professionals to render these essential professional services.  As noted below, Gordian has substantial expertise in all of the areas for which they are proposed to be retained.  Accordingly, Debtor submits that Gordian is well-qualified and best suited to perform these services and assist Debtor in this Chapter 11 Case.

68.      Prior to the Petition Date, Debtor negotiated the Gordian Agreement, a commercially reasonable compensation and employment agreement.  Debtor requests approval of the Gordian Agreement, including the compensation provisions pursuant to Bankruptcy Code

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

17

105013-001/2500562_1.doc

section 328(a). Debtor and Gordian have agreed that Gordian shall be paid and reimbursed as set forth, in detail, in the Gordian Agreement and the Kaufman Declaration.

**2.** **Compensation.**

69. In its pre-Petition Date involvement, Gordian infused $50,000 directly into Debtor for immediate financing to help fund operations. As a condition to entering the Gordian Agreement and Gordian's continued service to Debtor, Gordian received $50,000 from Debtor through MERS.

70. Additionally, pursuant to the Gordian Agreement, Gordian will be compensated for its broad range of services in connection with this engagement (the "Fee Structure") with fees payable concurrently with and as a condition to the consummation of any Financial Transaction (the "Transaction Fees") equal to (i) 10% of the first $5 million of Aggregate Consideration plus, (iii) 5% of all Aggregate Consideration in excess of $5 million in connection with any Financial Transaction

71. Pursuant to the Gordian Agreement, it is contemplated that such Transaction Fees shall be provided a carve out from the collateral of Debtor's senior lenders, including MERS, subordinated or on a "last out" basis with the proposed DIP Credit Facility, whereby Transaction Fees shall be paid from the collateral following satisfaction of the DIP Credit Facility.

72. In addition to the fees described above, Gordian shall be reimbursed, upon invoice, for all of its reasonable, documented out-of-pocket expenses (including legal, travel, telephone and facsimile) incurred in connection with Gordian's engagement hereunder; provided, however, that Gordian shall require the prior written consent of Debtor and MERS (which shall not be unreasonably withheld) before incurring aggregate expenses in excess of $25,000.

73. Debtor believes that the Fee Structure set forth in the Gordian Agreement is either comparable to, or below, those generally charged by financial advisory and investment banking firms of similar statute to Gordian and for comparable engagements, both in and out of bankruptcy proceedings. Given Debtor's liquidity constraints, the go-forward fee structure is fully tied to the consummation and closing of the transactions and services contemplated by

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

Debtor and Gordian in the Gordian Agreement. The Fee Structure was established to reflect the difficulty of the extensive assignments Gordian has undertaken and continues to undertake, and the potential that Debtor might not consummate a transaction.

74. Additionally, Gordian will endeavor to coordinate with other retained professionals herein to avoid unnecessary duplication of work and expense.

75. Gordian's restructuring and M&A capabilities as well as its capital markets knowledge and financing skills, some or all of which may be required by Debtor during the term of Gordian's engagement hereunder, were important factors to Debtor in determining the Fee Structure and Debtor believes that the ultimate benefit to Debtor of Gordian's services hereunder cannot be measured merely by reference to the number of hours to be expended by Gordian's professionals in the performance of such services.

76. Debtor also acknowledges and agrees that the Fee Structure has been agreed upon by the parties in anticipation that (a) a substantial commitment of professional time and effort has been and will continue to be required of Gordian and its professionals, (b) in light of the fact that such commitment may foreclose other opportunities for Gordian, and (c) that the actual time and commitment required of Gordian and its professionals to perform the services described in the Gordian Application may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

77. In light of the foregoing, Debtor believes that the Fee Structure is both fair and reasonable under the circumstances of this engagement.

78. Debtor is advised by Gordian that it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. Investment bankers such as Gordian do not charge for their services on an hourly basis. Instead, they customarily charge a monthly advisory fee plus an additional fee that is contingent upon the occurrence of a specified type of transaction. Nevertheless, in order to demonstrate the services provided by Gordian to Debtor, Gordian will file a summary of identifying those professionals which have provided services on behalf of Debtor and that provides a general description of the

**Gordon Silver**
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

services performed by Gordian, and estimated aggregate time in connection with any fee application filed with the Court.

79.     Debtor also understand that Gordian will be applying to the Court for authority to be paid its fees and expenses pursuant to its obligations under the Bankruptcy Code and any administrative fee procedure that may be established, to which Debtor consents.

80.     Debtor has agreed, among other things, and as more fully set forth in the Gordian Agreement, to indemnify and hold harmless Gordian and its personnel (the "Indemnified Persons") in connection with Gordian's representation of Debtor, subject to certain exceptions in the case of an Indemnified Person's bad faith, willful misconduct or gross negligence (the "Indemnification Provisions"). Debtor has been informed by Gordian that the Indemnification Provisions are customary and reasonable terms of consideration for financial advisors and investment bankers for proceedings both out of court and in chapter 11 cases. The terms of the Indemnification Provisions were negotiated between Debtor and Gordian at arm's-length and Debtor respectfully submits that the Indemnification Provisions are reasonable and in the best interests of Debtor, its estate, and creditors.

81.     Debtor intends that the services of Gordian will complement, and not duplicate, the services being rendered by other professionals in this Chapter 11 Case. Gordian understands that Debtor has retained and may retain additional professionals during the term of the engagement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on Debtor's behalf.

F.     **The Gordon Silver Application.**

82.     Debtor has selected GS as its attorneys because of the firm's knowledge of Debtor's business and financial affairs and GS's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code.

. . .

. . .

. . .

. . .

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

83. The terms of GS's retention are set forth in the Legal Representation Agreement (the "GS Retention Agreement") attached to the Salerno Declaration as **Exhibit "1."** The GS Retention Agreement permits GS to bill Debtor for services performed at current hourly rates and current charges for certain expenses, and that such matters are subject to reconsideration on a semi-annual basis. Talitha Gray Kozlowski is the attorney principally responsible for the representation and her rate is $410.00. Ms. Kozlowski has agreed not to charge Debtor for any travel time.

84. During the course of this representation, GS has become familiar with Debtor's business, financial affairs, and capital structure. Accordingly, GS has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of Debtor's Chapter 11 Case. GS is both well-qualified and able to represent Debtor in its Chapter 11 Case in a most efficient and timely manner.

**G.    The Heller Draper Application.**

85. Debtor has selected Heller Draper as its attorneys because of the firm's knowledge of Debtor's business and financial affairs and Heller Draper's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code.

86. The terms of Heller Draper's retention are set forth in the Legal Representation Agreement (the "HD Retention Agreement") attached to the Patrick Declaration as **Exhibit "1."** The HD Retention Agreement permits Heller Draper to bill Debtor for services performed at current hourly rates and current charges for certain expenses, and that such matters are subject to reconsideration on a semi-annual basis. William H. Patrick, III is the attorney principally responsible for the representation and his rate is $495.00.

87. During the course of this representation, Heller Draper has become familiar with Debtor's business, financial affairs, and capital structure. Accordingly, Heller Draper has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of Debtor's Chapter 11 Case. Heller Draper is both well-qualified and able to represent Debtor in its Chapter 11 Case in a most efficient and timely manner.

Gordon Silver
Attorneys At Law
One E Washington
Suite 400
Phoenix, Arizona 85004
(602) 256-0400

105013-001/2500562_1.doc

1    I declare under penalty of perjury of the laws of the United States that these facts are true

2  to the best of my knowledge and belief.

3          DATED this 4th day of December, 2014.

4

5                                        _____

6                                        SHANNON BARD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
One E Washington

105013-001/Omnibus Declaration[1].doc

22