# EXHIBIT 1

# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*"), dated as of March 4, 2015, is entered into by and among: (i) SNTech, Inc., a Delaware corporation ("*Seller*" or "*Debtor*") and (ii) Bluffton Motor Works LLC, an Ohio limited liability company ("*Purchaser*").

## PRELIMINARY STATEMENTS

A.      On December 4, 2014, Debtor filed a voluntary petition for relief under Chapter 11 ("*Chapter 11 Case*") of Title 11 of the U.S. Code (as amended, the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Arizona (the "*Bankruptcy Court*"). Debtor is continuing to operate its business as a debtor-in-possession as authorized by and in accordance with the Bankruptcy Code.

B.      Upon the terms and subject to the conditions set forth herein and pursuant to Sections 363 and 365 of the Bankruptcy Code, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase and acquire from Debtor, substantially all of Seller's assets that are used in or useful to Seller's (i) pump equipment manufacturing business (the "*Pump Business*") and (ii) OEM and after-market HVAC equipment business ("*HVAC Business*" and, together with the Pump Business, the "*Specified Business*").

C.      The parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale and Assumption Order (as defined in Section 1.26).

## AGREEMENT

In consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      *Definitions*.  As used in this agreement, the following defined terms have the meanings indicated below:

1.1      "*Accounts Receivable*" means all accounts receivable, notes receivable and any other of Seller's rights to receive payments, in each case, due and owing by any third party to Seller at Closing.

1.2      "*Action*" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Governmental or Regulatory Authority.

1.3      "*Auction*" means the auction, pursuant to the provisions set forth in this Agreement held at the law offices of Gordon Silver, One East Washington, Suite 400, Phoenix, Arizona 85004.

1.4      "*Bid Procedures Order*" means the Order: (I) Approving Bid Procedures Relating to Sale of the Seller's Assets, Including Bid Protections; (II) Scheduling a Hearing to

Consider the Sale; (III) Approving the Form and Manner of Notice of Sale by Auction; (IV) Establishing Procedures for Noticing and Determining Cure Amounts; and (V) Granting Related Relief entered by the Bankruptcy Court.

1.5 "*Books and Records*" means business records of Seller (in any form or medium), including all manuals, sales and credit records, pricing guidelines, computer files, operating data, invoices, supplier lists, supplier records, billing records, engineering records, drawings, blueprints, schematics, studies, customer lists, customer records, test records, financing records, and personnel and payroll records, to the extent they are directly related to the Purchased Assets, other than the Retained Books and Records.

1.6 "*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in the State of Arizona are authorized or obligated to close.

1.7 "*Contract*" means any written agreement, contract, lease, sublease, rental agreement, or similar agreement, purchase orders, arrangement, commitment, Permit or license (other than this Agreement or any instruments executed or delivered in connection herewith) in effect as of the Closing.

1.8 "*Cure Amounts*" means all cure amounts, pursuant to Section 365(b)(1)(A) or (B) of the Bankruptcy Code, owing under any Purchased Contracts as of the Closing Date that the Bankruptcy Court may order to be paid as a condition to Purchaser's assumption of any of the Purchased Contracts.

1.9 "*DIP Credit Facility*" means the loans tendered by the DIP Lender to Debtor as debtor-in-possession pursuant to the entry of an order of the Bankruptcy Court.

1.10 "*DIP Lender*" means Municipal Employee Retirement System of Louisiana and each additional participant providing debtor-in-possession financing to Debtor pursuant to the entry of an order of the Bankruptcy Court.

1.11 "*Escrow Agent*" shall mean Wells Fargo Bank N.A. and/or Gordon Silver.

1.12 "*Excluded Assets*" shall mean only the following assets of Seller: (i) the Retained Rights of Action; (ii) the formation documents of Seller (including any corporate charter, bylaws or certificates of organization or formation), qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, transfer books, equity interest certificates and other documents relating to the organization, maintenance and existence of Seller as a corporation; (iii) the Retained Books and Records; (iv) any of the rights of Seller under this Agreement or any other agreement between Seller, on the one hand, and Purchaser, on the other hand, entered into on or after the date of this Agreement; (v) all claims of Seller for refunds of Taxes; (vi) all Excluded Contracts; (vii) all revenues earned by and payable to Seller with respect to the Purchased Assets prior to the Closing Date; (viii) all Accounts Receivable of Seller, including, without limitation, those identified on Schedule 1.12(viii); (ix) cash held by Seller; (x) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder; (xi) all intellectual property owned by Seller other than the Intellectual Property; (xii) all assets, properties and rights used by Seller exclusively in its businesses other than the Specified

Business; (xiii) all of Seller's employee benefits plans or any other employee benefit plans in which any employees of Seller or the Specified Business participate (including, but not limited to, Seller's retirement plan and all assets held under such plan's trust); (xiv) all leasehold or other interests of Seller in any real property whatsoever; (xv) duplicate copies of any documents otherwise relating to both the Purchased Assets and the Excluded Assets or the Excluded Liabilities; and (xvi) those specific pieces of equipment listed on <u>Schedule 1.12(xvi)</u>.

       1.13    "*Excluded Contracts*" means all Contracts to which Seller is a party other than the Purchased Contracts.

       1.14    "*Governmental Order*" means any Law, order, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Governmental or Regulatory Authority of competent jurisdiction.

       1.15    "*Governmental or Regulatory Authority*" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

       1.16    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

       1.17    "*Laws*" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental or Regulatory Authority.

       1.18    "*Liability*" means any claim, as defined by Section 101(5) of the Bankruptcy Code, including, without limitation, any indebtedness, obligation or other liability (whether or not absolute, accrued, matured, contingent, liquidated, known, suspected, fixed or otherwise), fine, assessment, penalty, judgment, award, loss, claim, demand, damage or settlement respecting any Action.

       1.19    "*Lien*" means any lien, claim, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including, without limitation, the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

       1.20    "*Permit*" means any permits, licenses, franchises, approvals, certificates, certifications, consents, waivers, concessions, registrations or other authorizations of any Governmental or Regulatory Authority.

       1.21    "*Person*" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority.

       1.22    "*RBC Claims*" means those Rights of Action identified on <u>Schedule 1.22</u>.

1.23    "*Retained Books and Records*" means, collectively: (i) any corporate minute books, books and records of account, corporate records, financial records, and any other books and records that are not expressly defined in Books and Records; (ii) any Bankruptcy Court filings or documents relating to or necessary for winding up of Seller and the administration of the Bankruptcy Case; (iii) any materials about employees, disclosure of which would violate an employee's reasonable expectation of privacy; (iv) any materials that are subject to attorney-client privilege or which Seller is prohibited from disclosing or transferring to Purchaser under applicable Law and is required by applicable Law to retain; (v) any documents reasonably necessary for purposes of the prosecution, settlement or enforcement by Seller of the Retained Rights of Action; or (vi) any documents primarily relating to the Excluded Assets or the Excluded Liabilities.

1.24    "*Retained Rights of Action*" mean: (i) all Rights of Action arising under Sections 544, 545, 546, 547, 548, 549 and 550 of the Bankruptcy Code; (ii) all Rights of Action against current and former officers, directors, employees, or other persons or entities that are covered by an insurance policy insuring Seller or its officers, directors, employees, or other similar parties; and (iii) the RBC Claims.

1.25    "*Rights of Action*" mean any and all rights, claims (including claims as defined in the Bankruptcy Code), lawsuits, causes of action, rights of recovery, rights of set off, rights of recoupment, refunds, demands, defenses, judgments, accounts, and rights, claims, powers or privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in Contract or in tort, at Law or in equity, or under any other theory of law, held by Seller against any Person.

1.26    "*Sale and Assumption Order*" means the Order of the Bankruptcy Court authorizing and approving, among other things: (i) the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Purchaser on an "as is, where is" basis, free and clear of all interest, liens, claims and encumbrances (other than the Permitted Exceptions) pursuant to Section 363 of the Bankruptcy Code, with all such interests, liens, claims and encumbrances attaching to the proceeds of the sale; and (ii) the assumption and assignment of the Purchased Contracts included in the Purchased Assets.

1.27    "*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

1.28    "*Taxes*" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including Taxes under Section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other Tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and any expenses incurred in connection with the determination, settlement or litigation of any Tax Liability.

2.      *Purchase and Sale of Assets; Closing*.

2.1     *Assets*.  Upon the terms and subject to the conditions of this Agreement and the Sale and Assumption Order, on the Closing Date, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Liabilities (other than Assumed Liabilities) and Liens and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of the assets used in, or useful to, the Specified Business (whether recorded on the books and records of Seller or whether known or unknown, tangible or intangible), except for the Excluded Assets (the "*Purchased Assets*"), which Purchased Assets shall include, but not be limited to, the following assets of Seller:

(a)      all tangible assets, including, without limitation, fixed assets, furniture, fixtures, goods, equipment, inventories and computer hardware, wherever located, that are used in or useful to the Specified Business, including all such assets located at Seller's Fort Wayne, Indiana facility (the "*Personal Property*");

(b)      all intellectual property, including patents, trademarks, trade names, industrial designs, licenses (relating to rights to use intellectual property and software programs) and inventions that are used in or useful to the Specified Business (the "*Intellectual Property*");

(c)      website code and the related content solely relating to the Specified Business;

(d)      all right, title and interest in, and claims under, the Contracts of Seller specifically set forth on Schedule 2.1(d) (the "*Purchased Contracts*");

(e)      all Books and Records, other than the Retained Books and Records relating to the Specified Business;

(f)      all credits, deferred charges, refunds and prepaid expenses and deposits relating to the Purchased Assets;

(g)      all Rights of Action, other than the Retained Rights of Action;

(h)      all goodwill associated with the operation of the assets identified in clauses (a) through (g) set forth above; and

(i)      any other non-cash assets of Seller related directly to the assets identified in clauses (a) through (g) set forth above.

2.2     *Excluded Assets*.  Notwithstanding anything in this Agreement to the contrary, Seller shall not sell, transfer, convey, assign and deliver to Purchaser at the Closing the Excluded Assets, and such Excluded Assets shall not constitute a part of the Purchased Assets.

2.3     *Assumed Liabilities*.  At and as of the Closing, Purchaser shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (the "*Assumed Liabilities*"):

(a) all Liabilities accruing or due to be performed from and after the Closing Date pursuant to or in respect of all Purchased Assets;

(b) all performance or payment obligations arising under the Purchased Contracts after the date the Bankruptcy Court authorizes assumption and assignment of such Contracts (the "*Assumption Date*") but, in each case, only to the extent (i) such performance or payment obligations accrue, relate and are to be performed solely after the Assumption Date, (ii) such performance or payment obligation is not related to a breach thereof that occurred prior to the Assumption Date, and (iii) the corresponding benefits therefrom are validly assigned to and received by Purchaser;

(c) all Liabilities for any Cure Amounts;

(d) all Transactional Taxes; and

(e) all Liabilities for the portion of Periodic Taxes for which Purchaser is liable under Section 3.3(b).

2.4 *Excluded Liabilities*. Other than the Assumed Liabilities, Purchaser shall not assume or be liable for or bound by any Liabilities of Seller or any Lien (whether or not asserted, scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Bankruptcy Case, whether secured, priority, administrative or unsecured, or whether accruing prior to or after the commencement of the Bankruptcy Case) (collectively, the "*Excluded Liabilities*"). For the avoidance of doubt and without intending to limit the generality or effect of the foregoing, the Excluded Liabilities shall include the following Liabilities of Seller:

(a) all Liabilities under the Purchased Assets accruing prior to the Closing Date, including Liabilities relating to any warranties for assets or products sold by Seller to third parties; *provided, however*, that, with respect to Purchased Contracts, Purchaser shall not assume any Liabilities thereunder accruing prior to the Assumption Date;

(b) all Liabilities under the Excluded Contracts or in respect of any other Excluded Asset, in each case whether accruing prior to, at or after the Closing Date; and

(c) all Liabilities for the portion of Periodic Taxes for which Seller is liable under Section 3.3(b).

2.5 *Designation Rights*. Notwithstanding anything herein to the contrary, Purchaser reserves the right to unilaterally amend Schedule 2.1(d) to remove any Contract listed on Schedule 2.1(d) and designate such Contract as an Excluded Contract, in each case, at any time during the period commencing on the date of this Agreement and ending within one day prior to the Closing Date (the "*Designation Right Period*") and notice is given to Seller. Any Contract that is not designated as a Purchased Contract pursuant to this Section 2.5 at the expiration of the Designation Right Period shall be deemed an Excluded Contract and an Excluded Asset for all purposes of this Agreement

2.6     *Consideration and Deposit.*

(a)     The total consideration payable by Purchaser to Seller in consideration of the sale, transfer, conveyance, assignment and delivery of the Purchased Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, is: (i) an amount equal to One Million One Hundred Thousand Dollars ($1,100,000) (the "*Purchase Price*"); and (ii) the assumption by Purchaser of the Assumed Liabilities.

(b)     Purchaser has deposited with Escrow Agent in readily available funds Thirty Five Thousand Dollars ($35,000) (including any interest earned thereon, the "*Deposit*").  The Deposit shall be treated in accordance with the Bid Procedures Order.

(c)     Purchaser shall withhold Two Hundred Fifty Thousand Dollars ($250,000) (the "*Holdback Amount*") from the Purchase Price otherwise payable at Closing, which subject to Purchaser's offset rights set forth herein below, shall be paid by Buyer to Seller via a wire transfer of immediately available cash funds to an account designated by Seller in writing within three (3) business days of the date Purchaser completes the removal of the portion of the Purchased Assets, which at Closing are located at Seller's Korea facility (the "*Korea Purchased Assets*") from such facility.  Notwithstanding the forgoing, absent interference from Seller's Korea facility's landlord, Purchaser shall remove the Korea Purchased Assets from Seller's Korea facility within forty-five (45) days of Closing.  Any losses Purchaser suffers as a result of its inability to remove the Korea Assets from Seller's Korea facility shall first be offset against the Holdback Amount then outstanding.

(d)     Purchaser shall pay all Cure Amounts in respect of the Purchased Contracts upon the later of: (i) the Closing; or (ii) five Business Days after the Bankruptcy Court enters the Sale and Assumption Order.

2.7     *Purchase Price Allocation.*  Purchaser and Seller shall agree upon an allocation of the Purchase Price among the Purchased Assets in accordance with the allocation requirements of Section 1060 of the Internal Revenue Code within three Business Days prior to the Closing.  The allocation of the Purchase Price among the Purchased Assets agreed upon by the parties pursuant to this Section shall be agreed upon in writing, executed and delivered by Purchaser and Seller to each other (the "*Purchase Price Allocation Agreement*").  From and after the execution of the Purchase Price Allocation Agreement, any subsequent adjustment to the allocable Purchase Price shall be reflected in the Purchase Price Allocation Agreement in a manner consistent with Treasury Regulation Section 1.1060-1T.  Purchaser and Seller agree for all Tax purposes to report the transactions contemplated by this Agreement in a manner substantially consistent with the Purchase Price Allocation Agreement, and neither party will take any position materially inconsistent therewith in any Tax Return, in any refund claim, in any litigation or otherwise, unless required to do so by a Governmental Authority.  From and after the Closing, Purchaser and Seller shall each be responsible for the preparation of their own Form 8594 and other applicable forms in accordance with the applicable Tax laws, and each shall execute and deliver to the other such statements and forms as are commercially reasonably requested by the other party.

3.      *Closing*.

3.1      *Closing*.   The closing of the transactions contemplated herein (the "*Closing*") will take place at the offices of the Escrow Agent and shall occur on the later of: (i) March 10, 2015; (ii) the first Business Day after the Sale and Assumption Order entered by the Bankruptcy Court becomes a final, non-appealable order; and (iii) the first Business Day after the entry of any final, non-appealable order by the Bankruptcy Court resolving any objection to the assumption and assignment of a Purchased Contract (the "*Closing Date*") (or at such other time, place and date as may be mutually agreed in writing upon by Purchaser and Seller).

3.2      *Deliveries*.

(a)      At or prior to the Closing, Seller shall deliver the following to Escrow Agent:

(i)      an original executed bill of sale setting forth the Personal Property in the form attached as <u>Exhibit A</u>;

(ii)      an executed counterpart of the assignment of Purchased Contracts in the form attached as <u>Exhibit B</u> (the "*Assignment of Contracts*");

(iii)      an executed assignment of patents in the form attached hereto as <u>Exhibit C</u> ("*Patent Assignment*");

(iv)      any other certificates, contracts, documents and instruments required to be delivered by Seller under this Agreement or reasonably requested by Escrow Agent to consummate the Closing of the transactions contemplated herein;

(v)      a certificate duly executed by an officer of Seller, in a form reasonably satisfactory to Purchaser, certifying that to Seller's knowledge after due inquiry: (A) the representations and warranties of Seller in <u>Section 5</u> shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except to the extent that any representation or warranty speaks to a specific date, such representation or warranty shall be true and correct as of such date); and (B) all covenants, agreements and obligations contained in this Agreement to be performed or complied with by Seller on or prior to the Closing Date shall have been performed or complied with, in each case, in all material respects; and

(vi)      Seller shall have obtained the consent of the DIP Lender to sell the Purchased Assets pursuant to this Agreement free and clear of any and all liens that the DIP Lender may have in connection with the DIP Credit Facility.

(b)      At or prior to the Closing, Purchaser shall deliver the following to Escrow Agent:

(i)      the Purchase Price, less the Deposit and the Holdback Amount, and any other amounts due hereunder by Purchaser to consummate the transactions contemplated herein;

(ii)     an executed counterpart of the Assignment of Contracts; and

(iii)    the other certificates, contracts, documents and instruments required to be delivered by Purchaser under this Agreement or reasonably requested by Escrow Agent to consummate the Closing of the transactions contemplated herein.

3.3     *Tax Prorations and Costs.*

(a)     Any Taxes that may be payable by reason of the sale of the Purchased Assets under this Agreement (including any transfer, sales, use, value added, gross receipts, stamp, duty, stamp duty, documentary, registration, business and occupation and other similar taxes) (the "*Transaction Taxes*") shall be the responsibility and obligation of Purchaser. In no event shall either party to this Agreement be responsible for the Taxes based on net income, margin or gain of the other party that arises as a consequence of the consummation of the transactions contemplated hereby.

(b)     As to any Purchased Assets acquired by Purchaser, Seller and Purchaser shall apportion the liability for real and personal property taxes and ad valorem Taxes ("*Periodic Taxes*") for all Tax periods including but not beginning or ending on the Closing Date (the "*Proration Periods*"). For purposes of calculating prorations, Seller shall be deemed to be in title to the Purchased Assets, and, therefore, entitled to the income therefrom and responsible for the expenses for the entire day upon which the Closing occurs. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in such month and a 365 day year.

(c)     Purchaser acknowledges that to the extent that the Purchased Assets are located outside of the United States, all shipping, insurance and freight handling charges are the responsibility of Purchaser. Purchaser shall bear all risk of loss with respect to Personal Property from the moment the Personal Property is delivered to the carrier.

3.4     *Further Assurances.*

(a)     At any time or from time to time after the Closing, at Purchaser's request and without further consideration, Seller shall execute and deliver, and shall cause its affiliates, including, without limitation, its wholly-owned subsidiaries, SNTech Co., Ltd. and Thai SNTech Co., Ltd., to execute and deliver such other reasonable instruments and documents as may be reasonably necessary to effectuate this transaction. Without limiting the generality of the forgoing, from and after Closing, Seller shall and shall cause its affiliates, including, without limitation, its wholly-owned subsidiaries, SNTech Co., Ltd. and Thai SNTech Co., Ltd., to use commercially reasonable efforts to: (i) assist Purchaser with shipping any Purchased Assets that are located outside the United States at Closing to a location designated by Purchaser in its sole discretion; <u>provided</u>, <u>however</u>, that Purchaser shall be solely responsible for all shipping, insurance and freight handling charges, as well as necessary labor expenses related thereto; and (ii) provide Purchaser with access to Seller's facilities until at least March 31, 2015 for the sole purpose of allowing Purchaser to remove the Purchased Assets from such facilities; <u>provided</u>, <u>however</u>, that Purchaser shall only be responsible for a pro-rata portion of the monthly rent for

the facilities due and payable for March 2015, which shall be based on the amount of time Purchaser owns the Purchased Assets during the month of March 2015.

(b)     Notwithstanding anything contained herein to the contrary, in the event Seller or any successor in interest to the Seller and its bankruptcy estate, including any Chapter 7 trustee, has not pursued the RBC Claims within 180 days of Closing, Seller or any successor in interest to the Seller and its bankruptcy estate, including any Chapter 7 trustee, shall immediately assign such claims to Purchaser for no additional consideration, which assignment shall be acceptable to Purchaser in form and substance.  The parties hereby acknowledge and agree that the Purchase Price payable to Seller at Closing shall be good and adequate consideration for the assignment of the RBC Claims from Seller to Purchaser in accordance with the terms of this <u>Section 3.4</u>.

3.5     *Third-Party Consents*.  To the extent that any Purchased Asset is not transferable or assignable without the consent of another and such consent is not waived by operation of Sections 363 and 365 of the Bankruptcy Code or order of the Bankruptcy Court, this Agreement shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof or a default thereunder. Seller, on the one hand, and Purchaser, on the other hand, shall use their commercially reasonable efforts to obtain the consent of such other party to such assignment to Purchaser in all cases in which such consent is or may be required for such assignment.  The Purchase Price shall not be reduced as a result of the inability of Seller to obtain any such consent or assignment.

4.     *Pre-Closing Covenants*.  Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, reasonably necessary to consummate the transactions contemplated hereby as promptly as practicable, and neither Seller nor Purchaser shall take any action after the date hereof (other than any action required to be taken under this Agreement or to which the other shall have granted its consent) that could reasonably be expected to materially delay the consummation of the transactions contemplated hereby.

5.     *Representations and Warranties of Seller*.  Seller represents and warrants to Purchaser as follows:

5.1     *Organization*.  Seller is duly organized and validly existing under the laws of the jurisdiction of its organization.

5.2     *Authorization of Transaction*.  Subject only to Bankruptcy Court approval pursuant to the Sale and Assumption Order, Seller has full power and authority to execute and deliver this Agreement and each agreement, document or instrument required to be delivered by it hereby or in connection herewith and to perform its obligations under this Agreement and each agreement, document or instrument required to be delivered by it hereby or in connection herewith and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement and the other agreements, documents or instruments required to be delivered by Seller hereby or in connection herewith and the performance by Seller of its obligations hereunder and thereunder have been duly and validly authorized by all necessary action on the part of Seller.  This Agreement and each of the other agreements, documents or

instruments required to be delivered by Seller hereby or in connection herewith have been, or when executed and delivered will have been, duly executed and delivered by Seller and is, or once executed will be, the valid and binding agreement of Seller, enforceable against Seller in accordance with their respective terms.

5.3     *Litigation*.  Except for Actions filed in the Bankruptcy Court, described in the omnibus declaration of Seller or other pleadings filed in Seller's Chapter 11 Case, including Seller's Schedules and Statements filed with the Bankruptcy Court, or otherwise disclosed in writing to Purchaser, there are no Actions pending or, to Seller's knowledge after due inquiry, threatened in writing in the past three (3) years against Seller that: (i) question or challenge the validity of this Agreement or any of the other agreements, documents or instruments required to be delivered by Seller hereby or in connection herewith; (ii) question or challenge any action taken or proposed to be taken by Seller pursuant to this Agreement or any of the other agreements, documents or instruments required to be delivered by Seller hereby or in connection herewith; or (iii) that relate to the Purchased Assets or the Specified Business.

5.4     *Consents.*  Except for consents waived by operation of Section 365 of the Bankruptcy Code or order of the Bankruptcy Court or any customs or other similar requirements of any governmental authority, to Seller's knowledge after due inquiry, no approval or consent of, or filing with, any person, entity or governmental authority is required in connection with the transactions contemplated hereby, including, without limitation, the assignment or transfer of the Purchased Contracts, or the execution, delivery or performance by Seller of this Agreement or any other agreement or document delivered by or on behalf of Seller in connection herewith.

5.5     *Compliance with Laws; Permits*.  Except as excused by the Bankruptcy Code or Bankruptcy Court or otherwise in connection with the Chapter 11 Case: (i) to Seller's knowledge after due inquiry, Seller is not in material violation of any Laws relating to the Specified Business or the Purchased Assets; and (ii) Seller has not been notified that Seller has been or may be charged with any material violation of any provision of any Law relating to the Specified Business or the Purchased Assets.

5.6     *Title to Purchased Assets; Condition; Location*.  Seller has title to (or in the case of leased assets, valid and enforceable leasehold rights in), is the lawful owner or lessee of, and pursuant to the Sale and Assumption Order has the full right to sell, transfer, convey, assign and deliver the Purchased Assets, which shall be sold by Seller free and clear of all Liabilities (other than Assumed Liabilities) and Liens.  At and as of the Closing, Seller will convey to Purchaser title to (or in the case of leased assets, valid and enforceable leasehold rights in) the Purchased Assets free and clear of all Liabilities (other than Assumed Liabilities) and Liens (other than Liens relating to the Assumed Liabilities).  No person, other than Seller, owns or utilizes, except pursuant to a lease that shall be terminated as of the Closing Date, any or the Purchased Assets.  Schedule 5.6 sets forth, to the best of Seller's knowledge after due inquiry, the location of all of the Purchased Assets.  Except for the Excluded Assets, the Purchased Assets constitute all of the assets necessary for Purchaser to conduct the Specified Business.

5.7     *Intellectual Property*.  Seller owns, licenses or otherwise possesses legally enforceable rights to use all Intellectual Property registered in the United States currently used in, related to, necessary to or material to, the Specified Business.  Exhibit A sets forth a true,

correct and complete list of: (i) all issued patents, all registered trademarks, trade names, service marks and copyrights and all other Intellectual Property, owned, used or licensed by the Seller in connection with the Specified Business; (ii) the registration number, date of registration and jurisdiction of registration thereof, if applicable; (iii) the name of the registered owner and, if different, the user or users thereof; and (iv) any applications for any of the foregoing.

5.8 *As Is, Where Is Sale*. EXCEPT AS EXPRESSLY SET FORTH IN <u>SECTION 5</u>, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES. EXCEPT AS EXPRESSLY SET FORTH IN <u>SECTION 5</u>, PURCHASER ACKNOWLEDGES THAT THE ACQUIRED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND PURCHASED AND ACCEPTED BY, PURCHASER ON AN "*AS IS/WHERE IS*" BASIS AND "*WITH ALL FAULTS.*"

SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING IMPLIED WARRANTIES OF QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY AND ALL OTHER WARRANTIES IMPOSED OR RECOGNIZED BY STATUTE. ADDITIONALLY, SELLER MAKES NO WARRANTIES TO PERSONS THAT ARE DEFINED AS CONSUMERS IN THE MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT.

6. *Representations and Warranties of Purchaser*. Purchaser represents and warrants to Seller that the following statements are true and correct as of the date of this Agreement and as of the Closing:

6.1 *Organization, Qualification, and Corporate Power*. Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization.

6.2 *Authorization of Transaction*. Purchaser has full power and authority to execute, deliver and perform this Agreement and the other agreements and instruments to be executed and delivered by it in connection with the transactions contemplated hereby and to perform the obligations thereunder. Subject to the entry of a Bankruptcy Court Order, Purchaser does not need to give any notice to, make any filing with or obtain any authorization, consent or approval of any Governmental or Regulatory Authority in order for the parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, to file or to obtain any authorization, consent or approval would not have a material adverse effect on the ability of the parties to consummate the transactions contemplated by this Agreement.

6.3 *Sufficiency of Funds*. Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

6.4     *Legal Proceedings*.   There are no actions, suits, claims, investigations or other legal proceedings pending or, to Purchaser's knowledge, threatened against or by Purchaser or any Affiliate of Purchaser that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

6.5     *Independent Investigation*.   Purchaser has conducted its own independent investigation, review and analysis of the Specified Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of Seller set forth in <u>Section 5</u> and the provisions set forth in <u>Section 5.8</u>; and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Specified Business, the Purchased Assets or this Agreement, except as expressly set forth in <u>Section 5</u> of this Agreement.

7.      *Conditions to Closing*.

7.1     *Purchaser's Conditions to Closing*.   The obligations of Purchaser to proceed with the Closing are subject to the fulfillment at or prior to the Closing Date, of each of the conditions set forth in this <u>Section 7.1</u> ("*Purchaser's Conditions Precedent*"):

(a)     the representations and warranties of Seller in <u>Section 5</u> shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except to the extent that any representation or warranty speaks to a specific date, such representation or warranty shall be true and correct as of such date);

(b)     Seller shall have delivered to Escrow Agent the documents set forth in <u>Section 3.2(a)</u>;

(c)     all covenants, agreements and obligations contained in this Agreement to be performed or complied with by Seller on or prior to the Closing Date shall have been performed or complied with, in each case, in all material respects;

(d)     the written approval and consent of any Person for the assignment and assumption of all Purchased Contracts shall have been obtained to the extent that such approval and consent is required under the terms of such Purchased Contract; *provided, however*, such approval and consent shall not be required if such Purchased Contract may be assigned upon the Bankruptcy Court's entry of an order;

(e)     the Bankruptcy Court shall have entered a final, nonappealable order in the Chapter 11 Case, in form acceptable to Purchaser in its sole discretion, approving Purchaser's purchase of the Purchased Assets, which order shall, among other things: (i) include a specific finding that Purchaser is a good faith purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code and that Section 363(n) of the Bankruptcy Code is inapplicable; (ii) be binding on any successor Chapter 11 or Chapter 7 trustee; and (iii) approve Seller's assumption and assignment to Purchaser of the Purchased Contracts;

(f)     Seller shall have delivered to Purchaser evidence in a form reasonably satisfactory to Purchaser that all material assets of SNTech Co., Ltd. and Thai SNTech Co., Ltd. necessary for the operation of the Specified Business have been legally transferred to Seller and are included in the Purchased Assets;

(g)     Seller shall have used its best efforts to assist Purchaser with entering into consulting or employment agreements, the terms of which shall be acceptable to Purchaser, with those employees or affiliates of Seller that Purchaser, in its sole discretion, determines are necessary to conduct the Specified Business post-Closing, including, without limitation, those employees listed on Schedule 7.1(g); and

(h)     Either (i) Seller shall have amended that certain Assignment and License Agreement, dated August 22, 2011, between Seller and Regal Beloit Corporation (the "*RBC License*") to make it clear that Purchaser's usage of the intellectual property licensed to Seller pursuant to the RBC License would not be limited to any specific field of use, which amendment shall be agreeable (in form and substance) to Purchaser in its sole discretion; or (ii) the Sale and Assumption Order shall state, in a manner acceptable to the Purchaser (in form and substance) in its sole discretion, that, following Purchaser's assumption of the RBC License, Purchaser's usage of the intellectual property licensed to Seller pursuant to the RBC License would not be limited to any specific field of use.

Purchaser shall have the right to waive in writing any or all of the conditions precedent to its obligations hereunder; *provided*, *however*, that no waiver by Purchaser of any condition to its obligations hereunder shall constitute a waiver by Purchaser of any other condition precedent to its obligations hereunder.

7.2     *Seller's Closing Conditions*.  The obligations of Seller to proceed with the Closing are subject to the fulfillment at or prior to the Closing Date, of each of the conditions set forth in this Section 7.2 ("*Seller's Condition Precedent*"):

(a)     the representations and warranties of Purchaser in Section 6 shall be true and correct in all material respects as of the Effective Date with the same effect as though made on and as of the Closing Date;

(b)     Purchaser shall have delivered to Escrow Agent the documents and funds as set forth in Section 3.2(b); and

(c)     all covenants, agreements and obligations contained in this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date shall have been performed or complied with in all material respects.

Seller shall have the right to waive in writing any or all of the conditions precedent to their obligations hereunder; provided, however, that no waiver by Seller of any condition to their obligations hereunder shall constitute a waiver by Purchaser of any other condition precedent to its obligations hereunder.

8.     *Survival of Representations, Warranties, Covenants and Agreements*.  Seller and Purchaser have the right to rely fully upon the representations, warranties, covenants and agreements of the other contained in this Agreement.

9.     *Termination*.

9.1    *Termination*.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned upon the occurrence of any of the following:

(a)     at any time prior to the Closing, by mutual written agreement of Seller and Purchaser;

(b)     by Purchaser, if it is not then in material breach of this Agreement, upon written notice to Seller and Escrow Agent, if there shall be a material breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement, which breach has not been cured within five Business Days after the giving of written notice by Purchaser to Seller of such breach;

(c)     by Seller, if it is not then in material breach of this Agreement, upon written notice to Purchaser and Escrow Agent, if there shall be a material breach by Purchaser of any representation, warranty, covenant or agreement contained in this Agreement, which breach has not been cured within five Business Days after the giving of written notice by Seller to Purchaser of such breach;

(d)     by (i) Purchaser if any of the conditions in Section 7.1 has not been satisfied as of March 31, 2015 or if satisfaction of such a condition is or becomes impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement) and Purchaser has not expressly waived such condition; or (ii) Seller if any of the conditions in Section 7.2 has not been satisfied as of March 31, 2015 or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not expressly waived such condition;

(e)     by Purchaser or Seller if the Closing has not occurred (other than through the failure of the terminating party to comply fully with its obligations under this Agreement) on or before March 31, 2015.

9.2    *Effect of Termination*.  Upon the termination of this Agreement pursuant to Section 9.1, this Agreement, except this Section 9.2, Section 2.6(b), Section 10 and Section 11, shall become void and have no further effect and there shall be no liability hereunder on the part of Seller or Purchaser with respect to this Agreement except in connection with its obligations set forth in such Sections.

10.    *Miscellaneous*.

10.1   *Notices*.  Any notice required or permitted to be given under this Agreement shall be in writing and delivered or sent by: (i) personal delivery; or (ii) Federal Express or similar nationally recognized overnight courier service, and addressed to the parties at their respective addresses as they appear below.  The parties may change their addresses for

notice by giving notice of such change in accordance with this <u>Section 10.1</u>. Notices shall be deemed to have been received upon the date of delivery (or refusal to accept delivery) as indicated on the return receipt or air bill.

If to Seller:

SNTech, Inc.
Attention: Shannon Bard
1928 E. Highland Ave. F104-628
Phoenix, Arizona 85016

With a copy to:

Gordon Silver
Attention: Talitha Kozlowski, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169

and

Heller, Draper, Patrick, Horn & Dabney, L.L.C.
Attention: William H. Patrick, III. Esq. and Tristan Manthey, Esq.
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130

With a copy to:

Gordian Group
Attention: Peter S. Kaufman
950 Third Avenue, 17th Floor
New York, NY 10022

If to Purchaser:

Bluffton Motor Works LLC
410 East Spring Street
Bluffton, Indiana 46714
Attn: David Nussear, President
Facsimile: (260) 827-2471

With a copies to:

CapitalWorks, LLC
Two Chagrin Highlands
3000 Auburn Drive, Suite 430
Beachwood, Ohio 44122-4340
Attention: Todd Martin
Facsimile: (216) 781-6670

and

Calfee, Halter & Griswold LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio  44114
Attention:  Brent M. Pietrafese
Facsimile: (216) 241-0816

10.2    *Brokers*.   In the event of a claim for a broker's fee, finder's fee, commission or other similar compensation based upon any agreement alleged to have been made by Purchaser in connection herewith, Purchaser hereby agrees to reimburse Seller for any liability, loss, cost, damage or expense (including reasonable attorneys' and paralegals' fees and costs) which Seller may sustain or incur by reason of such claim.  The provisions of this <u>Section 10.2</u> shall survive the Closing or earlier termination of this Agreement.

10.3    *Entire Agreement*.   This Agreement (and the exhibits attached hereto) supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof between the parties, and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

10.4    *Expenses*.   Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, Seller and Purchaser shall bear their own costs and expenses arising out of the negotiation, execution, delivery and performance of this Agreement (including regulatory filing fees and costs) and the consummation of the transaction contemplated by this Agreement, including, without limitation, fees and expenses for legal counsel, accountants, business valuators, brokers and financial advisors.

10.5    *Waivers*.   No waiver of any breach of any covenant or provision contained herein will be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision contained herein.  No extension of time for performance of any obligation or act will be deemed an extension of the time for performance of any other obligation or act, except those of the waiving party, which will be extended by a period of time equal to the period of the delay.

10.6    *Attorneys' Fees*.   In the event of the bringing of any action, arbitration or suit by a party hereto against another party hereunder by reason of any breach of any of the covenants, agreements or provisions on the part of the other party arising out of this Agreement, then in that event the prevailing party will be entitled to have the recovery of and from the other party all costs and expenses of the action, arbitration or suit, reasonable attorneys' fees and any other professional fees resulting therefrom.

10.7    *Amendment*.   This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

10.8    *No Third Party Beneficiary*.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any Person.

10.9    *No Assignment; Binding Effect*.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto without the prior written consent of the other party hereto and any attempt to do so will be void. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

10.10   *Headings*.  The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

10.11   *Governing Law*.  This Agreement shall be governed by and construed exclusively in accordance with the Laws of the State of Arizona applicable to a contract executed and performed in such state, without giving effect to the conflicts of laws principles thereof.

10.12   *Consent to Jurisdiction; Venue*.  Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of Arizona or the United States Bankruptcy Court for the District of Arizona in any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court.  Each party hereby irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

10.13   *Invalid Provisions*.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (i) such provision will be fully severable, (ii) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof and (iii) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

10.14   *Counterparts*.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

10.15   *Construction of Certain Terms and Phrases*.  Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "*hereof*," "*herein*," "*hereby*" and derivative or similar words refer to this entire Agreement; (iv) the terms "*include*," "*includes*" and "*including*" mean including without limiting the generality of any description preceding such term, and, for purposes of this Agreement, the

rule of ejusdem generis shall not be applicable to limit a general statement that follows an enumeration of specific matters, to matters similar to the matters specifically enumerated; (v) reference to dollar amounts, unless otherwise specifically indicated, shall mean the lawful money of the United States of America; and (vi) the term "*Section*" refer to the specified Article or Section of this Agreement. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

10.16 *Attorney Representation.* In the negotiation, preparation and execution of this Agreement, each party has been represented by, or has been afforded the opportunity to consult with an attorney of such party's own choosing prior to the execution of this Agreement and has been advised that it is in such party's best interest to do so. The parties have read this Agreement in its entirety and fully understand its terms and provisions. The parties have executed this Agreement freely, voluntarily and without any coercion whatsoever, they accept all terms, conditions and provisions hereof.

10.17 *Non-recourse.* This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, debtor, stockholder, Affiliate, agent, attorney or other representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

10.18 *Exclusivity.* From the date of the entry of the Sale and Assumption Order until the Closing Date, Seller shall not, directly or indirectly, do any of the following, and Seller shall prevent all of its affiliates and representatives from, directly or indirectly, doing any of the following: (a) solicit, initiate or encourage the submission of any proposal or offer from any person relating to the acquisition of the Specified Business or the Purchased Assets, or any substantial portion thereof; (b) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any person to do or seek any of the foregoing; or (c) enter into any binding or non-binding obligation with respect to any of the foregoing.

11. *Sales Procedures.* This Agreement is subject in all respects to the approval of the Bankruptcy Court through the entry of the Sale and Assumption Order.

[*signature page follows*]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date set forth above.

PURCHASER:                                    SELLER:

Bluffton Motor Works LLC, an Ohio limited      SNTech, Inc., a Delaware corporation
liability company

By: ~~D. J. L. N~~                             By: _____
    Name: ~~DAvid L. Nusseal~~                     Name: _____
    Its: ~~President & CEO~~                        Its: _____

**Exhibits and Schedules:**

| | |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Assignment of Contracts |
| Exhibit C | Assignment of Patents |
| Schedule 1.12(viii) | Accounts Receivable |
| Schedule 1.12(xvi) | Excluded Equipment |
| Schedule 1.22 | RBC Claims |
| Schedule 2.1(d) | Purchased Contracts |
| Schedule 5.6 | Location of Purchased Assets |
| Schedule 7.1(g) | Required Employment/Consulting Agreements |

**Exhibit A**

**Bill of Sale**

**(Follows on next page.)**

**Exhibit B**

**Assignment of Contracts**

**(Follows on next page.)**

**Exhibit C**

**Assignment of Patents**

**(Follows on next page.)**

**Schedule 1.12(viii)**

**Accounts Receivable**

**(Accounts receivable as of December 15, 2014, follows on next page.)**

| Customer | Net Balance |
| --- | --- |
| Company A | $411,942 |
| Company B | $22,722 |
| Company C | $14,561 |
| Company D | $8,446 |
| Company E | $6,959 |
| Company F | $6,138 |
| Company G | $5,332 |
| Company H | $4,943 |
| Company I | $3,434 |
| Company J | $2,971 |
| Company K | $2,734 |
| Company L | $1,256 |
| Company M | $840 |
| Company N | $801 |
| Company O | $343 |
| Company P | $250 |
| Company Q | $200 |
| Company R | $200 |
| Company S | $200 |
| Company T | $165 |
| Company U | $131 |

{02933764.DOC;8 }      26
Case 2:14-bk-17914-EPB    Doc 233-1    Filed 03/04/15    Entered 03/04/15 17:51:32
Desc Exhibit 1    Page 27 of 33

## Schedule 1.12(xvi)

## Excluded Equipment

| Ref # | Date Acquired | Description | Location |
|-------|---------------|-------------|----------|
| P1 | 2/6/2012 | Pool loop chilling system | ECAR (Searcy, AR) |
| P2 | 3/13/2012 | Double end lacer | ECAR (Searcy, AR) |
| P3 | 3/30/2012 | Pool assembly equipment (11 Cleco Screwdrivers) | ECAR (Searcy, AR) |
| P22 | 4/3/2012 | Turns Counter/Resistance Meter | ECAR (Searcy, AR) |
| P4 | 4/30/2012 | Electrocraft purchased production line equipment | ECAR (Searcy, AR) |
| | 8/1/2012 | Welding Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Insulator Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | 2-Press Form Machines | ECAR (Searcy, AR) |
| | 8/1/2012 | Expansor | ECAR (Searcy, AR) |
| | 8/1/2012 | Lacing Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | 3-Winding Machines | ECAR (Searcy, AR) |
| | 8/1/2012 | 3-Winding Machines | ECAR (Searcy, AR) |
| | 8/1/2012 | Winding Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Insulator Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Winding Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Winding Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | IMCW Winding Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Drill Equipment | ECAR (Searcy, AR) |
| | 8/1/2012 | Die Caster | ECAR (Searcy, AR) |
| | 8/1/2012 | Stack & Skew | ECAR (Searcy, AR) |
| | 8/1/2012 | Lathe City | ECAR (Searcy, AR) |
| | 8/1/2012 | Balancer | ECAR (Searcy, AR) |
| | 8/1/2012 | 2 - BP Crimper | ECAR (Searcy, AR) |
| | 8/1/2012 | Packaging Machine | ECAR (Searcy, AR) |
| | 8/1/2012 | Rebuilt Alum Melt Furnace | ECAR (Searcy, AR) |
| | 8/1/2012 | Lynx-Daewoo CNC lathe | ECAR (Searcy, AR) |
| | 8/1/2012 | R2 Machining ES Square | ECAR (Searcy, AR) |
| | 8/1/2012 | R2 Machining ES Rounded | ECAR (Searcy, AR) |
| | 8/1/2012 | Baffle Press | ECAR (Searcy, AR) |
| | 8/1/2012 | Rectificadora Ex-Cell-O | ECAR (Searcy, AR) |
| | 8/1/2012 | Relocation and transition costs for Equip Purchased | ECAR (Searcy, AR) |
| P20 | 8/31/2012 | 2 Pneumatic Screwdrivers | ECAR (Searcy, AR) |
| P5 | 9/4/2012 | Snap Ring Gage - QA | ECAR (Searcy, AR) |
| P11 | 11/30/2012 | 3 Blade Packs | ECAR (Searcy, AR) |

| | | | |
|---|---|---|---|
| P13 | 1/7/2013 | 2 Magazine Wedges (24 Slot) | ECAR (Searcy, AR) |
| P9 | 1/11/2013 | Link M940 Double End Lacer | ECAR (Searcy, AR) |
| P16 | 1/31/2013 | 2-Zebra ZM400 Transfer Bar Code Printer | ECAR (Searcy, AR) |
| P25 | 2/5/2013 | Rotor Lathe Electronic Drive | ECAR (Searcy, AR) |
| P24 | 2/6/2013 | Rotor Lathe Power Supply | ECAR (Searcy, AR) |
| P19 | 3/25/2013 | Motor Replacement-Stator Welder | ECAR (Searcy, AR) |
| P29 | 4/30/2013 | 56 Frame Insulator Repair Part | ECAR (Searcy, AR) |
| P30 | 5/28/2013 | Height Gage | ECAR (Searcy, AR) |
| P28 | 5/31/2013 | CPU for Stator Welder | ECAR (Searcy, AR) |
| P21 | 10/31/2013 | Hot Drop Chiller | ECAR (Searcy, AR) |
| S6 | 10/3/2012 | MiniTab Software (for QA fuction) | Searcy |
| C6 | 10/20/2011 | Vostro 1540 BTX laptop | Searcy |
| C12 | 3/7/2012 | Dell Latitude E5520 | Searcy |
| O7 | 12/19/2012 | Cubicles in Warehouse-Searcy | Searcy |
| C21 | 1/2/2013 | Sony E17127CX/B Laptop | Searcy |

**Schedule 1.22**

**RBC Claims**

1.  All claims, causes of action, and rights of Seller and its affiliates against Regal Beloit Corporation.

## Schedule 2.1(d)

### Purchased Contracts

1.  That certain Assignment and License Agreement, dated August 22, 2011, between SNTech, Inc., a Delaware corporation and Regal Beloit Corporation, as may be amended up through Closing.

2.  That certain Tool Use Agreement, dated June 20, 2013, between SNTech, Inc., a Delaware corporation and Regal Beloit Corporation, a Wisconsin corporation, as such agreement may be amended up through Closing, pursuant to which Seller has rights to use certain tooling of Regal Beloit Corporation used by Seller in connection with the operation of the Specified Business.

**Schedule 5.6**

**Location of Purchased Assets**

**Schedule 7.1(g)**

**Required Employment/Consulting Agreements**

HVAC Business:
- YJ Ham (electromagnetics, hardware)
- KY Moon (PCB design)
- Gin Kim (mechanical design)
- Jong Won (GM Korea - general manufacturing and Korean operations)
- Paul Feller (HVAC final assembly)
- Jim Henjum (HVAC final assembly)
- Jordan Bass (HVAC and pool sales)

Pump Business:
- All employees or contractors located at Seller's Thailand facility that are employed or engaged by Seller as of the Date of this Agreement.
- Barry Benson (mechanical design)